Mark J. GREENFIELD,
*Respondent*
*Cross-Petitioner*
*Cross-Respondent,*

*v.*

MULTNOMAH COUNTY,
*Petitioner*
*Cross-Respondent*
*Cross-Respondent,*

*and*

BELLA ORGANIC, LLC;
Mike Hashem;
Elizabeth Hashem;
Johnny Kondilis-Hashem;
and Sofia Kondilis-Hashem,
*Respondents*
*Cross-Respondents*
*Cross-Petitioners.*

BELLA ORGANIC, LLC;
Mike Hashem;
Elizabeth Hashem;
Johnny Kondilis-Hashem;
and Sofia Kondilis-Hashem,
*Respondents*
*Cross-Petitioners,*

*v.*

MULTNOMAH COUNTY,
*Petitioner*
*Cross-Respondent,*

*and*

Mark J. GREENFIELD,
*Respondent*
*Cross-Respondent.*

Land Use Board of Appeals
2012102, 2012103; A154667

317 P3d 274

Jed Tomkins, Assistant County Attorney, argued the cause for petitioner-cross-respondent. With him on the briefs was Jenny M. Madkour, County Attorney.

Mark J. Greenfield argued the cause and filed the briefs *pro se.*

Ty K. Wyman argued the cause for respondents-cross-respondents-cross-petitioners. With him on the briefs were Brian R. Talcott and Dunn Carney Allen Higgins & Tongue LLP.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Multnomah County (county), over the objections of Mark Greenfield (Greenfield) and others, approved a modification to Bella Organic, LLC's farm stand permit. Under the modified permit, Bella Organic, LLC, was allowed to operate a farm stand for the sale of produce at its farm, which is zoned for exclusive farm use (EFU).[1]

Both Bella and Greenfield sought review of the permit modification order by the Land Use Board of Appeals (LUBA). LUBA agreed, at least in part, with some of the issues raised and, accordingly, remanded the case to the county. The county, Bella, and Greenfield seek review of LUBA's decision. We review the LUBA order to determine whether it is "unlawful in substance," ORS 197.850(9)(a), and, because we conclude that LUBA erred in its interpretation of the pertinent statute and rule, reverse and remand.

The legal issues in this case pertain to the scope of the farm stand statute, ORS 215.283(1)(o), as implemented by OAR 660-033-0130(23). More specifically, we must determine the scope of the statute's allowance of "fee-based activit[ies] to promote the sale of farm crops *** sold at the farm stand" and what limitations are placed on the use of structures in connection with a farm stand.

Because it is helpful for our analysis of the legal issues raised in this case, we begin with a description of the farm stand statute and its related policies. ORS 215.203 authorizes counties to adopt EFU zones. In those zones, land is to be used exclusively for farm uses "except as otherwise provided in ORS 215.213, 215.283 or 215.284." ORS 215.203(1). ORS 215.283(1), in turn, lists 23 nonfarm uses that counties must allow on EFU land, subject to state standards adopted by the Land Conservation and Development Commission (LCDC).[2] *See Brentmar v. Jackson County,* 321

---

[1] For ease of reference, in this opinion we refer to cross-petitioners Bella Organic, LLC, Mike Hashem, Elizabeth Hashem, Johnny Kondilis-Hashem, and Sofia Kondilis-Hashem collectively as "Bella."

[2] ORS 215.213 sets out a parallel allowance of nonfarm uses on EFU land in the few counties that regulate "marginal lands." ORS 215.213(1)(r) allows farm stands in text that is identical to ORS 215.283(1)(o). We refer to ORS 215.283(1)(o), the more broadly applicable statute, when referring to the "farm stand statute"

Or 481, 496, 900 P2d 1030 (1995) (uses delineated in ORS 215.283(1) allowed "as of right" and are not subject to additional local criteria).[3]

Pursuant to ORS 215.283(1)(o), "[f]arm stands" are one use that must be allowed in an EFU zone, provided that certain conditions are met. Those are:

"(A)   The structures are designed and used for the sale of farm crops or livestock grown on the farm operation, or grown on the farm operation and other farm operations in the local agricultural area, including the sale of retail incidental items and fee-based activity to promote the sale of farm crops or livestock sold at the farm stand if the annual sale of incidental items and fees from promotional activity do not make up more than 25 percent of the total annual sales of the farm stand; and

"(B)   The farm stand does not include structures designed for occupancy as a residence or for activity other than the sale of farm crops or livestock and does not include structures for banquets, public gatherings or public entertainment."

ORS 215.283(1)(o).

The pertinent administrative rule, OAR 660-033-0130(23), reiterates the text of ORS 215.283(1)(o), including its allowance of "fee-based activity to promote the sale of farm crops *** sold at the farm stand" (the promotions clause) and also adds two definitions, including the following:

"(c)   As used in this section, 'farm crops or livestock' includes both fresh and processed farm crops and livestock grown on the farm operation, or grown on the farm operation and other farm operations in the local agricultural area. As used in this subsection, 'processed crops and livestock' includes jams, syrups, apple cider, animal products and other similar farm crops and livestock that have been

_____

or "statute" in this opinion. The same analysis, however, would apply in the application of ORS 215.213(1)(r).

[3] By contrast, ORS 215.283(2) lists 27 nonfarm conditional uses. Those are uses that may be allowed if the county determines that they will not significantly affect surrounding lands devoted to farm or forest uses. *See* ORS 215.296(1) (setting out standards for approving ORS 215.283(2) nonfarm uses).

processed and converted into another product but not prepared food items."[4]

In its order, LUBA helpfully summarized the content of the farm stand statute and rule:

"To summarize, there are four main parts to the above farm stand rule. First, the farm stand rule authorizes structures that are 'designed and used for the sale of farm crops and livestock' that are grown on the farm where the farm stand is located. Second, the rule then authorizes two incidental uses that may accompany the sale of farm crops and livestock at a farm stand ('[1] sale of retail incidental items and [2] fee-based activity to promote the sale of farm crops or livestock sold at the farm stand'), and to make it clear that farm crops and livestock includes both 'fresh and processed farm crops and livestock,' but does not include 'prepared food items.' Third, the rule specifically provides that farm stand structures may not include structures that are designed for 'activities other than the sale of farm crops and livestock,' and further prohibits structures designed for 'banquets, public gatherings or public entertainment.' Finally, the rule limits annual sales from incidental retail sales and fees from promotional activity to no more than 25 percent of the total annual sales of the farm stand. This requirement apparently was imposed to ensure that the sale of farm crops and livestock is the main or primary purpose of farm stands, rather than the activities that may be carried out to promote the farm stand."

(Footnotes omitted.)

With that background in mind, we turn to the facts of this case. Bella grows organic crops on a farm on Sauvie Island in Multnomah County. In 2007, it obtained a permit to operate a farm stand to sell farm products, "incidental" retail items, and "prepared food from the farm stand." As

---

[4] The county is required to adopt land use regulations to implement LCDC rules that carry out the statewide planning goals. ORS 197.646 (post-acknowledgement implementation responsibilities). OAR 660-033-0130(23) effectuates some of the restrictions in Statewide Planning Goal 3 (Agricultural Lands). Accordingly, the county farm stand zoning ordinance provision, MCC 34.2625(G), apes the text of the LCDC rule. In deciding Bella's application for a modified farm stand permit, the county applied the farm stand statute and rule, as well as its own zoning ordinance. In this opinion, we refer to the "statute" or the "statute and rule" when construing those similar and related farm stand policies.

modified in 2008, the permit also authorized three fee-based special events each year at the farm, during which "a mobile food car[t] or food booths will be used to promote the organic produce of the farm." However, after obtaining the permit, Bella engaged in activities beyond the scope of what the permit allowed.

In 2012, pursuant to an agreement with the county to seek approval for those additional activities, Bella applied to modify the permit. As pertinent here, Bella sought approval for "[f]ee-based farm stand activities including * * * small-scale gatherings such as birthdays, picnics and similar activities to be conducted any time the farm stand is open for business" and "[f]ee-based farm-to-plate dinner[s], limited to a maximum number of 150 guests and limited to 45 events per year." The planning director approved those uses and some of the remaining requested activities. Both Bella and opponents of the modified permit appealed to a hearings officer, who modified the planning director's decision.

The hearings officer approved (1) farm-to-plate dinners, but reduced the number of allowed guests from 150 guests to 75 guests and the proposed maximum number of events from 45 events per year to 20 events; (2) two additional catered farm-to-plate dinners; (3) up to 24 "[h]arvest festivals, including related fee-based activities"; (4) "small-scale gatherings such as birthdays, picnics, and similar activities"; and (5) food carts for the expanded number of special events. The hearings officer denied Bella's request to use tents on the property in connection with the dinner events and other activities.[5]

Both Bella and Greenfield petitioned LUBA for review of the hearings officer's decision. Among a number of contentions, and relying upon the legislative history of the farm stand statute, Greenfield asserted that the allowed farm-to-plate dinners were the functional equivalent of a

---

[5] The hearings officer imposed other conditions that Bella contested on review to LUBA. LUBA concluded that the county's conditions on the use of wholesale sales in the 25 percent rule calculation, a required annual accounting, and the closure of a road crossing were proper. Bella assigns error to those determinations by LUBA, and we reject those assignments of error without published discussion.

"banquet" or a "restaurant," neither of which is permissible as a farm stand use. He also contended that the "small-scale gatherings" allowance was not within the scope of the promotions clause of ORS 215.283(1)(o) and OAR 660-033-0130(23), and that food carts could not be allowed under the promotions clause. Bella argued that the hearings officer erred in concluding that tents and the existing farm maze viewing platform were impermissible uses of structures under the farm stand rule.

LUBA concluded that the rule's prohibitions on certain activities within farm stand structures (occupancy as a residence; activities other than the sale of farm crops and livestock; and use for banquets, public gatherings, or public entertainment) implicitly precluded those same activities outside of the farm stand structures. Based on that determination, LUBA reasoned that the outdoor farm-to-plate dinners were prohibited because the rule precludes "banquets" in a farm stand structure. LUBA also determined that farm stand structures could be used for the sale of farm crops and livestock and related incidental or promotional activities, and not solely for the sale of incidental retail items or promotional activities, but that the requested tents and corn maze viewing platform were "structures" that were improper as they were solely for the sale of incidental retail items or promotional activities. LUBA further concluded that the county's allowance of food carts was too extensive to qualify as "incidental retail sales" and remanded the permit for a more limited food cart allowance. Finally, LUBA determined that the "small-scale gatherings" use allowance was consistent with the farm stand rule.

All three parties to the case seek review of the LUBA opinion and order. The county argues that LUBA improperly applied the farm stand rule to deny the use allowance for farm-to-plate dinners, preclude the use of structures solely for retail incidental sales and promotional activities, and limit the use of food carts. Greenfield, for his part, complains that LUBA misconstrued the rule in affirming the allowance of the "small-scale gatherings" use and in allowing *any* food cart use. Bella asserts that LUBA incorrectly interpreted the rule in imposing its limitations on the use of tents and the corn maze viewing structure.

Thus, the issues we must address are (1) whether outdoor dinners to be conducted at Bella's farm, so-called "farm-to-plate" dinners, are "fee-based activit[ies] to promote the sale of farm crops * * * sold at the farm stand"; (2) whether the rule precludes structures that are used solely for incidental retail sales or fee-based promotional activities, and not otherwise used for the sale of farm crops and livestock, and, if so, whether food carts, tents, and a corn maze public viewing platform are those types of prohibited structures; (3) whether the rule's allowance of the sale of "retail incidental items" implies a limit on the extent of any allowed food cart sales; and (4) whether the approved "small-scale gatherings such as birthdays, picnics, and similar activities" as conditioned by the permit are within the scope of the promotions clause.

We begin with the county's contention that LUBA erred in precluding outdoor farm-to-plate dinners as an authorized farm stand use. As noted, Bella applied for approval of "[f]ee-based farm-to-plate dinner[s], limited to a maximum number of 150 guests and limited to 45 events per year." The application described those events as including a tour of the farm's greenhouses and crop fields, a cooking demonstration using the farm's produce, consumption of that food at the dinner, and "[a]t the conclusion of each dinner, Bella [giving] each customer a basket of our fruits, vegetable[s], flower[s], cheese, milk, apple cider, jams and sauces," costing $25 for the dinner and $75 for the box of produce. The hearings officer concluded that the frequency of the proposed events and the large number of customers had "the appearance of a weekend restaurant or banquet facility[,]" and limited the approved farm-to-plate dinners to no more than 20 events with no more than 75 guests each, together with an allowance of another two catered dinners each year.

Based on the legislative history of ORS 215.283(1)(o), LUBA concluded that the statute and rule allowed "fee-based activity to promote the sale of farm crops or livestock sold at the farm stand" to occur outside of the confines of a farm stand structure. LUBA noted:

"Turning to the farm stand rule text, resolving the issue presented in this appeal is complicated by a serious shortcoming in the rule language. The farm stand rule

authorizes 'farm stands,' but does not define that term. The rule expressly *authorizes structures* to be 'designed and used' for some activities and for sales of some items (sale of farm crops or livestock, sale of retail incidental items, fee-based promotional activity), but also *prohibits some structures* that are designed for other uses (banquets, public gatherings or public entertainment). The rule says nothing explicitly about whether farm stand activities are permissible outside structures, raising a question regarding whether the rule authorizes any outdoor activities or in any way limits any authorized outdoor activities.

"Although the text is quiet about outdoor activities, the legislative history makes it clear that the legislature intended to authorize farm stands to conduct at least some activities outside structures. There are some easy examples of activities that by their very nature generally occur outdoors. A question could also be raised regarding whether the activities the rule authorizes in structures can also be conducted outdoors. We need not decide that question definitively here, but we see no obvious reason why the legislature could have generally intended to preclude the activities it authorized for farm stand structures from occurring outdoors where appropriate. So, for example, if a fee-based apple cider tasting event is appropriate as a 'fee-based activity to promote the sale of farm crops' in a farm stand building, we see no obvious reason why that event could not be held outdoors. A far more difficult question, and the question presented by Greenfield's second and third assignments of error, is whether an event that would clearly be prohibited in a farm stand structure (such as a banquet) is permissible, so long as it (1) otherwise qualifies as a 'fee-based activity to promote the sale of farm crops' and (2) is conducted entirely outdoors."

(Footnote omitted; emphases in original.)

LUBA acknowledged that outdoor farm-to-plate dinners could "reasonably be viewed as related to farm product production and could reasonably be expected 'to promote the sale of farm crops or livestock' sold at Bella's farm stand." Nonetheless, LUBA concluded that outdoor "banquets" were implicitly precluded by the rule's limitation on "structures for banquets":

"As we have already noted, the rule is admittedly awkward because it is written in terms of the design and use

of *structures* and prohibitions on *structures* designed for activities other than the sale of farm crops and livestock. If the rule is interpreted literally, it does not authorize any activities that would be carried out entirely outdoors. But if the rule is nevertheless to be read to authorize appropriate activities outside structures, as we have already concluded is appropriate, we believe it is also appropriate to consider whether the *prohibitions* the rule places on structures that are designed for certain activities might also apply to those activities themselves, even if those prohibited activities would be carried out entirely outdoors. We have no idea why the legislature used the word 'banquets' to encapsulate its concerns regarding farm stands providing food service. But we cannot agree with the county that the concerns that the legislature had about banquets, which led it to ban structures designed for banquets, would be entirely alleviated if the banquet is simply moved outdoors. If the legislature believes farm to plate al fresco dinners of the type, scale and frequency authorized here should be viewed as something other than a banquet and allowed at farm stands, the farm stand statute and farm stand rule will need to be amended to state that intent. We conclude that the authorized farm to plate dinners are accurately described as 'banquets' and are not permitted under the farm stand statute and the farm stand rule."

(Emphases in original.)

On review, the county contends that LUBA erred in construing the statute and rule to preclude outdoor uses if the use is not allowed within a farm stand structure. Instead, the county asserts that a "fee-based activity to promote the sale of farm crops" is one that is related to agriculture and that "promotes, or is reasonably calculated to promote, the contemporaneous sale of farm crops or livestock sold at the farm stand." Applying that test, the county contends that the proposed farm-to-plate dinners promote the contemporaneous sale of farm crops because farm crops are sold as part of the dinner and the event occurs during farm stand operations. The county asserts that the statute and rule primarily limit farm-to-plate dinners by the 25 percent of annual sales limitation and by preventing the use of the farm stand itself for that use. Bella echoes the county's contentions. Greenfield, on the other hand, argues that LUBA correctly interpreted the statute and rule.

Those contentions present two issues concerning the meaning of ORS 215.283(1)(o): (1) whether the promotions clause—the statutory allowance of "fee-based activity to promote the sale of farm crops or livestock"—is a stand-alone permitted use, regardless of whether the activity takes place inside of a structure or not, as opposed to a subcategory of uses for which farm stand "structures are designed and used"; and, if so, (2) whether the statute limits those promotional activities to exclude activities that cannot be included in a farm stand structure (residential occupancy, banquets, public gatherings or public entertainment).

We construe the statute and rule under the statutory construction principles set out in ORS 174.020 and *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), as modified by *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009). We give primary weight to the text and context of the provision in light of any legislative history that may be appropriately considered. If the meaning of the statute remains unclear after consideration of its text, context, and legislative history, we "resort to general maxims of statutory construction to aid in resolving the remaining uncertainty." *Gaines*, 346 Or at 172.

As noted, ORS 215.283 provides, in part:

"(1)   The following uses may be established in any area zoned for exclusive farm use:

"* * * * *

"(o)   Farm stands if:

"(A)   The structures are designed and used for the sale of farm crops or livestock grown on the farm operation, or grown on the farm operation and other farm operations in the local agricultural area, including the sale of retail incidental items and fee-based activity to promote the sale of farm crops or livestock sold at the farm stand if the annual sale of incidental items and fees from promotional activity do not make up more than 25 percent of the total annual sales of the farm stand; and

"(B)   The farm stand does not include structures designed for occupancy as a residence or for activity other than the sale of farm crops or livestock and does not include structures for banquets, public gatherings or public entertainment."

On its face, the provision appears to allow only "[f]arm stands," that is, "structures *** designed and used for the sale of farm crops or livestock." "Stand" is defined to mean "a small often open-air structure for a small business < cigar ~ > < roadside fruit ~ >." *Webster's Third New Int'l Dictionary* 2223 (unabridged ed 2002). The ordinary meaning of a "farm stand" is a structure used for retail sales of farm products. Thus, the plain text of the statute appears to authorize that use on EFU land, but to further allow the design and use of the farm stand structure to include retail sale of incidental items. It does not, on its face, allow the design of the farm stand structure for residential use or the use of the structure for public eating, gathering, or entertainment.

The promotions clause—the phrase "and fee-based activity to promote the sale of farm crops or livestock sold at the farm stand"—however, is ambiguous. On the one hand, the promotions clause could refer to a sale activity included in the allowance of the "sale of farm crops or livestock" (*i.e.*, "sale of farm crops or livestock *** including the sale of retail incidental items and [including the sale of] fee-based activity to promote"). On the other hand, the phrase could be independent of the predicate text and intended to describe a separately allowed use of the area in or around a farm stand (*i.e.*, "structures *** designed and used for the sale of farm crops or livestock *** including the sale of retail incidental items and [permitted] fee-based activity to promote").

Each alternative construction has grammatical problems. If the statute were to be construed to refer to both the sale of "items" and "activity," it would more likely reference "items" and "activities." The use of the singular word "activity" suggests that the word is not tied to the "sale of" predicate. *See Schuette v. Dept. of Rev.*, 326 Or 213, 217-18, 951 P2d 690 (1997) (legislature's use of singular, as opposed to plural, terms is significant evidence of its intent). Moreover, if the "sale of *** [a] fee-based activity" only means selling items that are tickets to promotional activities, that use allowance seems oddly narrow and possibly redundant of the otherwise allowed "sale of retail incidental items."

Yet, if the promotions clause is independent of the phrase "including the sale of," it has no other moorings in the statute to a noun, preposition, adjective, or verb that would give it content. We could necessarily infer such a link, as in "[t]he structures are designed and used for the sale of * * * retail incidental items and [used with allowed] fee-based activity to promote the sale of farm crops or livestock." That inference may run the risk of "insert[ing]" into the statute "what has been omitted[.]" ORS 174.010.

The legislative history of ORS 215.283(1)(o) resolves this quandary. The farm stand EFU allowance was adopted by the legislature in Oregon Laws 1993, chapter 466, section 2 (SB 675), which amended ORS 215.283(1) to allow "[f]arm stands" if,

"(A)  The structures are designed and used for the sale of farm crops and livestock grown on farms in the local agricultural area, including the sale of retail incidental items, if the sales of the incidental items make up no more than 25 percent of the total sales of the farm stand; and

"(B)  The farm stand does not include structures designed for occupancy as a residence or for activities other than the sale of farm crops and livestock and does not include structures for banquets, public gatherings or public entertainment."

SB 675 was sponsored by Senator Bob Kintigh, who described the measure as "permit[ing] operators of farm stands to sell accessory and promotional items as long as the sale of such items does not exceed 25% of the gross. * * * The bill is very narrowly written and had the support of LCDC and the Farm Bureau as well as many small farmers." Testimony, House Natural Resources Committee, June 29, 1993, Ex S. Senator Kintigh further explained:

"The proposed bill contained provisions for promotional events. That language was eliminated because such events are not land use issues. Activities such as school tours, fund raising events and other limited duration events are accessory or incidental uses that promote the sales of farm crops raised on the farm and sold at farmstands.

"Such promotion activities, if added to the statute could create the misconception that other unlisted activities would be prohibited.

"* * * * *

"Should such occasional and incidental use become the predominant use of the farm, such uses either become a commercial activity in conjunction with farm use or home occupations, subject to county review. As long as such activities remain an incidental part of farm activities, there is no problem."

*Id.*, Ex V.

Thus, as initially adopted, the farm stand statute pertained exclusively to the use and design of a farm stand structure. The statute allowed sales activities within farm stands, limited the extent of the sale of incidental items within farm stands, and prohibited the design and use of the farm stand for activities other than the sale of farm crops and livestock. Any use of the farm for promotional events was outside the allowance of the farm stand use and justifiable only under separate statutory authority.

The promotions clause was added to the statute in 2001 to authorize promotional activities in addition to the farm stand use allowance. Or Laws 2001, ch 757, § 3 (HB 3924). As originally introduced, HB 3924 would have enacted significant changes to the farm stand statute by eliminating the 25 percent rule and the prohibition of structures for "banquets, public gatherings or public entertainment." The A-Engrossed version of HB 3924 also expressly authorized structures "for food service and banquets, public gatherings and public entertainment." The sponsor of the bill, Representative Donna Nelson, described the measure as relaxing "stringent laws that restrict [farmers from] being able to promote their products for immediate sales * * *." Testimony, House Committee on Agriculture and Forestry, HB 3924, Apr 26, 2001, Ex H.

The bill was considered by the House Committee on Agriculture and Forestry on April 26, May 3, and May 10, 2001. Some committee members expressed concern about the removal of controls over promotional activities on farmland; those concerns were reiterated by others in public testimony before the committee. Representative Robert Ackerman summarized that concern:

"I would favor your amendment if we could define some scope of it * * *. In dropping out the [structure prohibitions] I think there is some allowance for abuse there because you could turn a stand into a concession, a restaurant, a place for banquets, other public gatherings which would accommodate public entertainment. * * * But I wouldn't want to have a stadium built for a rodeo or facilities built for a mini county fair * * *. So I think if we could define the scope of what the stand is and keep it in some reasonable approximation of what exists now, I would have no problem in encouraging other incidental uses of the farm land or the farm structures which are preexisting * * *. But I am just afraid the way it's written that we could have large concessions, we could have stadium and public entertainment on exclusive farm use property and I don't think that is as far as we want to go."

Tape Recording, House Committee on Agriculture and Forestry, HB 3924, Apr 26, 2001, Tape 83, Side B.

During the course of the hearings, concerns were raised about the use of farmland for large parking lots, and structures housing large concessions, commercial ventures not tied to the farm itself, restaurants, supermarkets, or public entertainment uses. Ultimately, the bill was redrafted by Representative Nelson, with collaboration by representatives of the Oregon Farm Bureau and the Department of Land Conservation and Development (DLCD). Representative Nelson agreed to reinstate the 25 percent rule and the limitations on the use of the farm stand, but to add an express allowance for promotional activities. At the May 10, 2001, hearing on the B-Engrossed bill that was ultimately adopted, the committee chair, Representative Jeff Kropf, described the bill as "making a minor modification to the current statute * * * that allows incidental items and fee-based activities to transpire," such as "hayrides * * * [and] that type of thing." Tape Recording, House Committee on Agriculture and Forestry, HB 3924, May 10, 2001, Tape 91, Side B. A DLCD representative stated that the bill "would clarify the types of activities that we think now are appropriate and can go forward as part of a farm stand without getting crosswise with the mass gathering statute or having an unintended consequence of some other large scale commercial activity or restaurant going into a farm zone." *Id.* (statement of Ron Eber).

Thus, apart from minor editing changes, HB 3924 amended the existing farm stand statute only to add "and fee-based activity to promote the sale of farm crops or livestock sold at the farm stand" to paragraph (A) of the statute and to add "and fees from promotional activity" to the 25 percent rule. The limits on farm stand structures in the statute were not changed. The intent to expand the use of farmland for promotional activities was carried out in that single addition to the statute. The purpose of the additional text, then, was to add to the uses allowed by the statute—to authorize promotional activities, outside of a farm stand structure, as part of a farm stand permit allowance, activities that were not otherwise accessory uses to the farm stand or authorized by other laws. *See, e.g.*, ORS 215.283(2)(a) (allowing as a conditional use "[c]ommercial activities that are in conjunction with farm use"); ORS 433.735 to 433.770 (regulating outdoor mass gatherings).

In light of that history, we easily conclude that the promotions clause in ORS 215.283(1)(o) authorizes promotional activities outside of a farm stand structure and that the clause is not limited to allowing sales or other activities inside of a farm stand structure. Given that conclusion, we must decide whether—as LUBA concluded—the statute's limitations on certain activities inside of a farm stand structure (banquets, public gatherings or public entertainment) apply to those separately authorized outdoor promotional activities.

Again, the legislative history provides guidance. As noted by LUBA, the types of outdoor activities discussed by the legislators as within the scope of the promotions clause included group activities or public gatherings, as well as activities that are entertaining or educational, such as farm animal exhibits, hayrides, pumpkin patch rides, cow trains, farm product food contests, and farm product food preparation demonstrations. There was no expressed sentiment to allow outdoor farm promotional activities—but only if they were unentertaining and attended by only a few people, as would be the case if the statute's limitations on structures equally applied to outdoor promotional activities. Indeed, much, if not most, promotional activity involves collective action, *e.g.*, a conclave to watch the making of cider or jam from farm products or the staging and viewing of farm

animal exhibits, that creates a gathering and is often amusing or entertaining. Instead, the legislative concern was to avoid the placement of commercial structures on farmland that were related to farm marketing, such as restaurants, supermarkets, and stadiums. *See* Tape Recording, House Committee on Agriculture and Forestry, HB 3924, May 3, 2001, Tape 88, Side A (statement of DLCD representative Bob Rindy) ("So our concern is generally here that we would take the farm stand language dealing with farm stands and expand it into structures that would be for promotional activities * * *.").

It follows, then, that the restrictions in ORS 215.283(1)(o)(B) on the scope of activities *inside* farm stand structures (the preclusion of structures for banquets, public gatherings, or public entertainment) do not apply to activities *outside* of those structures that are separately authorized by ORS 215.283(1)(o)(A). Had the legislature intended a broader effect of the statute's limitations on the use of structures, it would have written the restriction as a limit on any farm stand use rather than a limit on the use of structures. Accordingly, we conclude that LUBA erred when it concluded that outdoor promotional dinners are not an allowed promotional activity because "banquets" are not permitted in a farm stand structure. On remand, LUBA may consider Greenfield's remaining procedural objections to the county's allowance of the farm-to-plate dinners.

The county next contends that LUBA erred in construing the statute and rule to preclude the use of a farm stand structure solely for the sale of retail items or for a fee-based promotional activity. LUBA concluded that "[t]he farm stand rule authorizes the 'sale of retail incidental items and fee-based activity to promote the sale of farm crops or livestock' inside structures that are 'designed and used for sale of farm crops and livestock,' but it does not authorize structures that are specifically designed and used for retail sales and fee-based promotional activity." For that reason, LUBA remanded the permit to the hearings officer to consider whether the requested tents and corn maze viewing structure qualified as structures that are "designed and used for the sale of farm crops and livestock grown on the farm operation."

On review, the county argues that the statute limits the design and use of farm stand structures to the "sale of farm crops or livestock grown on the farm operation," but that the rule categorizes that "sale of farm crops or livestock" to "includ[e] the sale of retail incidental items and fee-based [promotional] activity[.]" Under the statute, according to the county, the use of a structure for the sale of retail incidental items or for promotional activity is a use for the sale of farm crops or livestock.

We disagree with the county's broad reading of the statute. As noted, the phrase "fee-based activity to promote the sale of farm crops or livestock" operates as a stand-alone use allowance. The promotions clause is not "includ[ed]" as an elaboration on the permissible sales uses of a farm stand structure. Promotional activities, under the statute, are uses other than "the sale of farm crops or livestock." The statute's allowance of the use of a farm stand structure for "the sale of farm crops or livestock" does not include the outright use of the structure for promotional activities, much less use of a structure *only* for those activities.[6]

By contrast, "the sale of farm crops or livestock" in ORS 215.283(1)(o)(A) *is* categorized as "including the sale of retail incidental items." That allowance, however, means that the farm stand structure can be designed and used for the sale of farm crops and livestock *and* the sale of retail incidental items, not that a farm stand could be used to sell only retail incidental items. The 25 percent rule requires that the predominant use of the farm stand be the sale of farm crops and livestock, as opposed to incidental items. Based on that understanding, we conclude that LUBA did not err in precluding the use of farm stand structures solely for promotional uses and the sale of retail incidental items.

As noted, LUBA remanded the permit modification order to the county to determine whether the corn maze viewing platform and proposed tents were "structures" under the rule that were to be designed and used for the sale of farm crops and livestock. LUBA did not determine whether food carts were "structures" under the rule, but—consistent

---

[6] We express no opinion on whether promotional activity inside a farm stand structure could be an accessory use of that structure.

with its view that the statute's use limitations within farm stand structures were also use limitations outside of those structures—held that a "broad unlimited authorization of food carts at Bella's farm stand cannot be characterized as 'sales of retail incidental items' and is therefore not permitted under the farm stand rule."

On review, the county argues that "structures" as used in the statute "refers to building-like structures in or upon which the public may gather (e.g., barn, shed, tent canopy, corn maze viewing platform, etc.)." (Emphases omitted.) According to the county, ticket kiosks and food carts are not structures and would, therefore, not be confined to farm crop and livestock sales use under the rule. Bella argues that the term "structures" should not be interpreted to include tents, canopies, or portable viewing platforms that are temporarily constructed; instead, according to Bella, the term "structures" refers to roofed and walled structures built for permanent use. Greenfield asserts that a structure is anything that is built or constructed, and that the term includes tents, canopies, food carts, and viewing platforms. We conclude that the term "structures" in the statute means something built or constructed for temporary or permanent use or occupancy by members of the public. Thus, we conclude, for the reasons stated below, that tents, canopies, portable viewing platforms, food carts, and ticket kiosks are "structures" under the farm stand statute and are subject to the use and design limitations of that statute.

The ordinary meaning of "structure" is quite broad—"something constructed or built." *Webster's* at 2267; *see also Black's Law Dictionary* 1464 (8th ed 2005) (defining "structure" to mean "[a]ny construction, production, or piece of work artificially built up or composed of parts purposefully joined together < a building is a structure >"). "Structure" may have a more particular meaning depending upon the context of the word's use. *See Dept. of Transportation v. Stallcup*, 341 Or 93, 99-100, 138 P3d 9 (2006) (rejecting reliance on a dictionary definition of a statutory term in favor of a meaning suggested by the statute's context). The term "structures" in ORS 215.283(1)(o) plainly refers to structures that are used or could be used for the uses or activities allowed or disallowed by the farm stand rule. Those

uses and activities described in the statute generally involve public use of a structure for purchasing farm crops, livestock, or retail incidental items, group promotional activity, banquets, public gatherings, and public entertainment. We conclude that "structure" in that context means something constructed or built for public use or occupancy.

As noted, Bella contends that "structure" does not include temporary structures such as tents or canopies and, instead, the term refers only to a "building"—something that is roofed, walled, and built for permanent use. While it is true that a building is a "structure," not every structure is a building as Bella suggests. The meaning of "structure" noted earlier ("something constructed or built") is not so limited. In ordinary parlance, things that are not roofed and walled are often referenced as structures, *e.g.*, a bridge, aqueduct, electrical transmission tower, performance stage, or sports stadium. As stated earlier, the dictionary meaning of "stand" in the sense of a farm stand is "a small open-air structure for a small retail business." *Webster's* at 2223. Moreover, the county defined the term "structure" for purposes of the farm stand ordinance as "an edifice or building." MCC 34.0005 (defining "[s]tructure" under the zoning ordinance as "[t]hat which is built or constructed[, a]n edifice or building of any kind, or any piece of work artificially built up or composed of parts joined together in some definite manner").

Another contextually related part of ORS 215.283(1) references nonbuilding "structures." ORS 215.283(1)(t) allows as a nonfarm use "[i]rrigation reservoirs, canals, delivery lines and those structures and accessory operational facilities" associated with particular service districts. It is likely that the legislature intended a common meaning for "structures" within ORS 215.283. *See Hale v. Klemp*, 220 Or App 27, 32, 184 P3d 1185 (2008) ("When we examine the text of the statute, we always do so in context, which includes, among other things, other provisions of the statute of which the disputed provision is a part.").

Finally, the committee deliberations on HB 3924, noted earlier, reflect concern about the construction of nonbuilding structures on EFU land under the promotions clause of the farm stand statute. *See* Tape Recording, House

Committee on Agriculture and Forestry, HB 3924, Apr 26, 2001, Tape 83, Side B (statement of Rep Al King) (wanting to "keep the rollercoasters off of the farm"); *id.* (statement of Rep Mary Nolan) (expressing desire to not "promote roller-coasters or whatever else" but to "help farmers stay on their farms and keep that land in productive use"); *id.* (statement of Rep Robert Ackerman) (wanting "banquets out there in a farm setting" but not "a stadium for a rodeo"). Thus, "structures" as used in ORS 215.283(1)(o) includes buildings and nonbuilding structures—that is, structures constructed or built for public occupancy or use that are not roofed or enclosed by walls.

The use of the term "structures" in the statute does not imply that the structure must be a permanent edifice. Farm stands, by their nature, are often seasonal in use. The ordinary understanding of a farm stand ("a small often open-air structure for a small retail business") would include a temporary structure erected at the side of a road to market produce to the traveling public. Although the public may not occupy a small road-side farm stand in any meaningful way, members of the public use the stand when they visit it to peruse or buy farm goods. That kind of temporary structure necessarily is one of the types of structures that the legislature intended to be authorized by ORS 215.283(1)(o).

Another part of ORS 215.283 corroborates that "structures," as used in the statute, includes temporary structures. ORS 215.283(4) allows certain "agri-tourism and other commercial events or activities that are related to and supportive of agriculture" on EFU land if, among other things, the "event or activity occurs outdoors, in temporary structures, or in existing permitted structures, subject to health and fire and life safety requirements[.]" ORS 215.283(4)(a)(F). In ordaining that "structures" can be temporary in character for purposes of the nonfarm use in ORS 215.283(4)(a)(F), the legislature implies that "structures" can be temporary in character for the nonfarm use allowed in ORS 215.283(1)(o). *See Pete's Mountain Homeowners v. Ore. Water Resources*, 236 Or App 507, 518, 238 P3d 395 (2010) ("It is a longstanding principle of statutory construction that words may be assumed to be used consistently throughout a statute.").

In our view, food carts and ticket kiosks are "structures" for the same reason that small road-side farm stands are "structures." Although members of the public may not ordinarily occupy food carts and kiosks (except those food carts that are large enough to encompass dining areas), they use the carts and kiosks in a way that is directly analogous to the way in which the public makes use of small farm stands: in each case, a person approaches the edifice to purchase something (a good, service, or ticket) that is being sold from within it. Thus, food carts and kiosks are things that are "constructed or built for public use." Accordingly, they are "structures" for purposes of ORS 215.283(1)(o).

Thus, we conclude that LUBA did not err in concluding that "structures," as used in the farm stand statute, does include tents, canopies, portable viewing platforms, and ticket kiosks. We are not certain, however, whether LUBA considered food carts to be "structures." If LUBA concluded that food carts are *not* structures, we agree with Greenfield that that conclusion was erroneous. Because food carts are structures, they are permissible under the farm stand statute only if they are "designed and used for the sale of farm crops or livestock grown on the farm operation" and are not designed for activities other than the sale of farm crops or livestock. ORS 215.283(1)(o). On remand, LUBA may choose to determine itself whether the food carts meet those requirements, or it may direct the county hearings officer to make that determination along with the other determinations that LUBA has directed.

Assuming that food carts fit that design and use limitation, the county next argues that LUBA erred in construing the statute to limit the degree of food cart use at the farm stand. LUBA reasoned as follows:

"The scope of the appealed permit's authorization for food carts is not entirely clear. All parties all appear to agree the challenged decision authorizes multiple food carts that are permitted to sell a variety of prepared food at up to 24 events per year, and we see no limit in the permit itself on the total number of food carts that potentially could be provided at special events. At least some of the food apparently would have no connection with Bella's produce. We have no trouble agreeing with Greenfield that such an

expansive authorization of food carts cannot be character- ized as 'incidental retail sales' and is not permissible under the farm stand rule. Collectively those food carts could be every bit as large a food concession as the Blueberry Café, which was at the heart of the legislature's concern in adopt- ing the 2001 legislative amendments.

"However, we do not agree with Greenfield's broader and more categorical argument that under no circum- stances could a food cart be approved under the farm stand rule. The authorized special events presumably will draw crowds of people who will want to purchase food to eat and will include at least some people who wish to purchase something other than Bella's organic produce to eat. If one cart or a limited number of food carts are provided at the special event and their operation is conditioned so that they are incidental to the special event, we cannot say that the farm stand rule categorically would preclude approval of such food carts. We note that while the farm stand rule does not specify what kind of 'prepared food' can be sold at farm stands or how that prepared food can be sold, by clarifying that prepared foods do not constitute 'processed farm crops or livestock' for purposes of the 25 percent rule, it appears to assume that *some* prepared food will be sold at farm stands. So long as any authorization of food carts at farm stand special events is appropriately limited so that it constitutes 'sales of retail incidental items' in conjunction with farm stand sales and special events that are 'fee based activity to promote the sale of farm crops or livestock,' we believe they could be approved under the farm stand rule."

(Emphasis in original.)

The county contends that the 25 percent rule is the only limit on the extent of promotional uses and that the allowance of the sale of retail "incidental" items limits the type of items sold and not, as determined by LUBA, the extent of those sales. Elaborating further, the county reasons:

"Moreover, the legislature was aware that it did not need the term 'incidental' in the phrase 'retail *incidental* items' to operate as a *limit* on the *amount* of certain sales; indeed, such meaning would be redundant and unneces- sary because *limiting* the *amount* of certain sales *is pre- cisely the role* of the 25 percent rule. That is, the 25 percent rule ensures that the sale of farm crops and livestock far

exceeds the sale of all other items. As such, the 25 percent rule by itself achieves the results sought by LUBA of limiting the frequency of occurrence and the number of units of certain sales—no other statutory provision is required to achieve that result, and LUBA erred in giving such effect to the term 'incidental' in the phrase 'retail *incidental* items.'"

(Emphases in original.)

We agree in part with the county. As noted, food carts are "structures" under the statute and are to be designed and used for the sale of farm crops, and can additionally be used for "the sale of retail incidental items." ORS 215.283(1)(o)(A).[7] "Incidental" in the statute modifies "items." LUBA erred to whatever extent it implied that "incidental" particularly limited the amount of the sales of incidental items. That limitation, as the county observes, is set out in the 25 percent rule. The plain meaning of "incidental" is "subordinate, nonessential, or attendant in position or significance: as * * * occurring as a minor concomitant < allowing a few dollars extra for expenses >." *Webster's* at 1142. "Incidental items" would mean a few items among many others. "Incidental" in the farm stand statute, then, limits the number of the types of nonfarm crops or livestock items sold at the farm stand. LUBA correctly remanded the food carts allowance to the county to determine if the extent of the types of food items sold at the allowed food carts would be more than "incidental."

The final question on review concerns whether LUBA erred in affirming the county allowance of "small-scale gatherings such as birthdays, picnics, and similar activities" as a farm stand use. Noting that the "purpose of the special events and fee based activities shall be to promote the contemporaneous sale of farm crops or livestock grown on the farm operation and other farm operations in the local agricultural area," the hearings officer allowed:

"Fee-based farm stand activities shall promote the farm stand and contemporaneous crops sold in the farm stand. Fee-based activities include a cow-train, school tours, and

---

[7] Under the LCDC farm stand rule, OAR 660-033-0130(23), the sale of "prepared food items" in a farm stand structure is not part of the sale of "farm crops or livestock," but is considered to be the "sale of retail incidental items."

small-scale gatherings such as birthdays, picnics, and similar activities can be conducted any time the farm stand is open for retail sales."

In his fifth assignment of error before LUBA, Greenfield argued that this approval was too open-ended and that "by authorizing undefined 'similar events,' the Hearings Officer may be authorizing events that the county earlier deemed unlawful at farm stands (*e.g.* corporate events, weddings)." He asserted that birthday parties had no connection to farm uses and could not reasonably be staged to primarily promote farm stand sales. LUBA agreed

"that corporate retreats, family reunions, and weddings inherently lack a sufficient connection with agriculture and sale of farm crops or livestock to qualify as farm stand promotional events. To that list we would add concerts and there are likely other activities that by their very nature have too tenuous a connection with sale of farm crops and livestock * * *."

But LUBA disagreed with Greenfield that the birthday parties could not be for the purpose of promoting farm uses. It adopted the county's understanding that the allowed events would be "conducted as farm-themed events and include a tour of the farm, educational presentations on farm operations, and the harvesting of farm crops." LUBA concluded that,

"[t]o the extent Greenfield argues small scale birthday gatherings, picnics and similar activities by their nature cannot be made to promote sale of farm crops or livestock, we reject the argument. We do not agree the hearings officer's decision must be remanded for being too vague about the nature of the authorized activities."

In a separate concurrence, board member Ryan disagreed with the majority's disposition of Greenfield's fifth assignment of error. She asserted that the majority did not "articulate a principled distinction between 'birthday parties, picnics and similar activities' that the majority finds are acceptable promotional activities, and 'corporate events, family reunions, weddings,' and other unnamed activities that the majority concludes have too tenuous a connection with the sale of farm crops to be acceptable promotional

activities." Board member Ryan also demurred to the majority's conclusion that "small scale * * * similar activities" were consistent with the promotions clause because there was "nothing in the decision [that] attempt[ed] to define the parameters of those phrases."

On review, Greenfield advances the same contentions that he raised before LUBA (or that the concurring board member raised), adding that the allowed incidental and promotional uses under the rule are those "that relate directly and substantially to everyday activities on the farm where the farm stand is located. In contrast, birthday parties, picnics and similar activities relate to family or friend gatherings, not the farm." Greenfield further argues that the condition adopted by the hearings officer is too vague to assure compliance or to permit efficient enforcement.

In response, the county asserts that the use allowance is expressly conditioned on compliance with the farm stand rule—that it promote the sale of farm crops or livestock, comply with the 25 percent rule, and occur outdoors, and not in a structure. The county points to the permit application narrative as supporting the conclusion that the allowed use complies with the promotions clause:

> "Farms are popular destinations for small group celebrations such as birthday parties and picnics and are typically held in conjunction with u-pick activities or during the pumpkin season. They are held when families are meeting at the farm to pick berries, fruits, or pumpkins. The purpose of these gatherings is to participate in the group activity of harvesting one or more of the farm crops. The gatherings are proposed to be conducted only when the farm stand is open, introducing party/picnic attendees to the farm and encouraging the purchase of fruits and vegetables either during the event or in the future. The benefit of these gatherings is the exposure it provides to the farm and the potential for increased sales at the farm stand and U-pick fields."

According to the county, those small-scale uses are to be distinguished from corporate retreats, family reunions, and weddings, where the "primary focus of these gatherings is on the underlying cause for the gatherings rather than the farm operation." The county argues that "similar activities"

under the *ejusdem generis* principle are "intimate, small-scale, family-oriented event[s] that include[] an introduction to the farm operation and the harvesting and purchase of farm crops."

We agree with the county that LUBA correctly concluded that birthday parties and other small-scale uses could be activities to primarily promote the sale of products at the farm stand. The county conditioned the activities upon their "promot[ion of] the farm stand and contemporaneous crops sold in the farm stand" and required that the activities occur only during the times that the farm stand is open for business. The county and Bella explained how that promotion was feasible—by including farm tours, educational presentations about farming, or farming or harvesting activities as a significant part of the event. Those promotional activities are more likely to be a significant part of a short-duration event such as a birthday party or family picnic than a longer event with more participants, such as a corporate retreat or a wedding. Bella's assurances and the county's requirement of those promotional activities made it likely and reasonably certain that the statutory standard would be met. *See Meyer v. City of Portland,* 67 Or App 274, 280 n 5, 678 P2d 741, *rev den,* 297 Or 82, 679 P2d 1367 (1984) (evidentiary record of a land use decision must show that compliance with the approval standards was "likely and reasonably certain"). ORS 215.283(1) does not require that farm stand permits condition the approval by requiring particular methods of promoting farm products.[8] Thus, we conclude that LUBA did not err in affirming the allowance of this type of activity in the modified farm stand permit.

In sum, then, on the county's petition for review, we conclude that LUBA erred in concluding that outdoor farm-to-plate dinners are not within the scope of the statute's allowance of "fee-based activity to promote the sale of farm crops or livestock sold at the farm stand." We also conclude that, if LUBA determined that food carts are not structures, that determination was erroneous. On remand,

---

[8] By comparison, ORS 215.296(2) allows the imposition of clear and objective conditions in order to assure compliance with approval standards for nonfarm conditional uses under ORS 215.283(2) or (4).

it must be determined (either directly by LUBA or by the county on further remand) whether food carts meet the ORS 215.283(1)(o) requirements for farm stand structures, that is, whether they are "designed and used for the sale of farm crops or livestock grown on the farm operation" and are not designed for other activities. If the food carts do meet those requirements, LUBA erred in limiting the number of food carts used at Bella's farm stand (as opposed to the extent of the items sold at the food carts). On Greenfield's cross-petition for review, we agree that, to the extent that LUBA considered food carts not to be "structures," it erred. Otherwise, we affirm LUBA's order.

On Multnomah County's petition, reversed and remanded in part, otherwise affirmed; on Mark Greenfield's cross-petition, reversed and remanded in part, otherwise affirmed; on Bella Organic, LLC's cross-petition, affirmed.