Argued and submitted November 7, 2014, reversed on petition; affirmed on cross-petition February 4, petition for review allowed April 23, 2015 (357 Or 164)

LAKE OSWEGO PRESERVATION SOCIETY,
Marylou Colver, and Erin O'Rurke-Meadors,
*Respondents,*
*Cross-Petitioners,*

*v.*

CITY OF LAKE OSWEGO,
*Respondent,*
*Cross-Respondent,*

*and*

Marjorie HANSON,
trustee for the Mary Cadwell Wilmot Trust,
*Petitioner,*
*Cross-Respondent.*

Land Use Board of Appeals
2014009; A157619

344 P3d 26

Christopher P. Koback argued the cause for petitioner-cross-respondent. With him on the briefs was Hathaway Koback Connors LLP.

Daniel Kearns argued the cause for respondents-cross-petitioners Lake Oswego Preservation Society, Marylou Colver, and Erin O'Rurke-Meadors. With him on the brief was Reeve Kearns, PC.

Evan P. Boone argued the cause and filed the brief for respondent-cross-respondent City of Lake Oswego.

Before Armstrong, Presiding Judge, and Egan, Judge, and Wollheim, Senior Judge.

EGAN, J.

## EGAN, J.

Marjorie Hanson, Trustee for the Wilmot Trust (Hanson), is the current owner of property subject to a historic designation that was placed on that property by the City of Lake Oswego in 1990, approximately five years before the enactment of ORS 197.772—the statute at issue in this case. Shortly after the designation, Richard Wilmot, one of the original owners of the property,[1] attempted to have the historic designation removed. The city rejected that request. Hanson made a second request for removal of the designation in 2013. The city's Historic Resources Advisory Board rejected Hanson's request, and the city council held a hearing on the issue. At Hanson's behest, the city considered her request "solely under ORS 197.772(3)"[2] and not under a land use application.[3] Respondent Lake Oswego Preservation Society (LOPS)[4] appeared through counsel at the hearing to oppose removal of the historic designation. The city concluded that, "as the local government that imposed the historic designation," it was "mandated by state law to remove the historic designation" and that Hanson was "entitled per ORS 197.772(3) to require the [c]ity to remove the historic designation from the subject property."

LOPS filed a timely appeal with the Land Use Board of Appeals (LUBA). LUBA concluded that the city had erroneously interpreted ORS 197.772(3), and reversed and remanded the city's decision to remove the historic designation. Hanson now seeks judicial review of LUBA's final order, raising two assignments of error. Hanson contends that LUBA lacked jurisdiction to hear the appeal and that LUBA's conclusion on the merits was incorrect. We reject

---

[1] Richard and Mary Wilmot acquired the property as tenants by the entirety. After Richard Wilmot's death in 2001, Mary Wilmot transferred the property to the Wilmot Trust. Hanson is the successor trustee of that trust.

[2] ORS 197.772(3) provides, "A local government shall allow a property owner to remove from the property a historic property designation that was imposed on the property by the local government."

[3] Hanson initially filed a land use application, seeking to remove the historic designation under the procedures set forth in the city's local land use regulations, in addition to ORS 197.772(3). However, she later withdrew that application and ultimately sought to remove the historic designation only under ORS 197.772(3).

[4] Respondents are LOPS, Marylou Colver, and Erin O'Rurke-Meadors. For simplicity, we collectively refer to those parties as respondent.

Hanson's contention that LUBA lacked jurisdiction but conclude that LUBA's interpretation of ORS 197.772(3) was erroneous. LOPS also filed a cross-petition, which we summarily reject.[5] Accordingly, we reverse LUBA's order.

On review, Hanson first argues that the city's decision under ORS 197.772(3) is not a "land use decision,"[6] over which LUBA has exclusive jurisdiction, ORS 197.825(1), because that statute only requires the city to determine whether a historic designation was imposed on a property— a determination that does not concern planning goals, comprehensive plan provisions, or land use regulations. To support that argument, Hanson cites *Leupold & Stevens, Inc. v. City of Beaverton*, 226 Or App 374, 203 P3d 309 (2009). For the following reasons, we reject that argument.[7]

In *Leupold*, the city adopted an ordinance annexing Leupold's property into the city. In the midst of other legal actions before LUBA and this court challenging the adoption of that ordinance, Leupold sent a letter to the city "demanding that it rescind the * * * ordinance" in light of a newly enacted state law that "restrict[ed] the city's ability to annex certain industrial properties" without the property owner's consent. *Id.* at 376-77. The city did not take any action on the demand, in part, because the Court of Appeals

---

[5] LOPS argues that LUBA's determination that the historic designation had been "imposed" on the property was unlawful in substance and not supported by substantial evidence, ORS 197.850(9), because, although Richard Wilmot had objected to the original historic designation, he had not pursued that objection after the city modified the designation. Having reviewed LUBA's order, the city council's "Findings, Conclusions, & Order," and the evidence in the record, we conclude that LUBA's determination that Richard Wilmot had objected to the historic designation was supported by substantial evidence. Further, we conclude that LUBA's determination that the historic designation was imposed on the property based on that objection was not unlawful in substance.

[6] A land use decision includes:

"(A) A final decision or determination made by a local government * * * that concerns the adoption, amendment or application of:

"(i) The goals;

"(ii) A comprehensive plan provision;

"(iii) A land use regulation; or

"(iv) A new land use regulation[.]"

ORS 197.015(10)(a).

[7] We reject Hanson's additional arguments about LUBA's jurisdiction without written discussion.

and LUBA cases were pending.[8] Leupold then filed an action in circuit court seeking declaratory and injunctive relief on the question whether the city's ordinance was valid in light of the adoption of the new state law. *Id.* at 377-78. The circuit court dismissed the action, concluding that it lacked subject matter jurisdiction to determine whether the ordinance was valid, in light of the new state law, as that would be a "land use decision." *Id.* at 377.

Leupold appealed the dismissal and we reversed. After assuming that the city's decision not to act on Leupold's demand was a "decision," we concluded that it was not a land use decision, noting that a "determination by a local government relating only to the applicability of [the state legislation] would not, on its own, be a land use decision." *Id.* at 379-80. We further noted that, because the state legislation did not "involve application of land use planning goals or any comprehensive plan provision," a decision that does "nothing more than determine the applicability of the [state legislation] would not meet the statutory definition of a 'land use decision.'" *Id.* at 380.

Relying on that language, Hanson asserts that the city's decision to remove the historic designation under ORS 197.772(3) is not a land use decision. In Hanson's view, the city has simply made a "decision determining the applicability of state law," and, like in *Leupold*, that decision does not involve the application of any land use planning goals or comprehensive plan provision. Thus, Hanson argues that LUBA did not have jurisdiction because the city did not make a land use decision as defined in ORS 197.015.

The problem with Hanson's argument is that it fails to account for the city's actions that occurred as a consequence of its conclusion that ORS 197.772(3) applied to Hanson's property. The city concluded that the statute applied, requiring removal of the historic designation. The city lists all historic resources on the Landmark Designation List—the local inventory of historic sites, structures, and objects—which is codified in Lake Oswego Municipal Code,

---

[8] Ultimately, the actions before LUBA and us—on the issue of the validity of the city's adoption of the ordinance—were resolved in the city's favor. *Leupold,* 226 Or App at 376-77.

section 50.06.009. After deciding that ORS 197.772(3) required it to remove the historic designation, the city then removed the property from the Landmark Designation List by amending section 50.06.009. Thus, the city did more than just determine the applicability of state law. It amended the Landmark Designation List, a land use regulation, which places the city's actions squarely within the definition of "land use decision." ORS 197.015(10)(a)(A)(iii) (defining "land use decision" to include "[a] final decision or determination made by a local government *** that concerns the *** amendment *** of *** [a] land use regulation"). Hanson does not point to any applicable exclusion from the definition of "land use decision" and we find none. Thus, we reject Hanson's first assignment of error and conclude that LUBA had jurisdiction to hear LOPS's appeal.

We next examine Hanson's second assignment of error challenging LUBA's interpretation of ORS 197.772(3). ORS 197.772 provides, in part:

"(1)  Notwithstanding any other provision of law, a local government shall allow *a property owner* to refuse to consent to any form of historic property designation at any point during the designation process. Such refusal to consent shall remove the property from any form of consideration for historic property designation under ORS 358.480 to 358.545 [concerning application, classification, and assessment of historic properties for statewide preservation program] or other law except for consideration or nomination to the National Register of Historic Places pursuant to the National Historic Preservation Act of 1966, as amended (16 U.S.C. 470 et seq.).

"*****

"(3)  A local government shall allow *a property owner* to remove from the property a historic property designation that was imposed on the property by the local government."

(Emphasis added.) Thus, the statute has two functions. Under subsection (1), for designations made after the statute's enactment, a local government cannot place a historic designation on the property if the property owner refuses to consent to the designation. And, under subsection (3) of the statute, a local government must remove a designation placed on the property if (1) the individual seeking removal

of the historic designation is "a property owner" to whom the statute applies, and (2) "a historic property designation" had been "imposed on the property by the local government."

In determining if the city properly applied subsection (3) to Hanson's property, in its order, LUBA confronted the meaning of "imposed on the property" and whether "a property owner" included only persons who owned the property at the time of the historic designation or also included subsequent owners. Based on a prior LUBA opinion and the legislative history of ORS 197.772(3), LUBA concluded that the phrase "imposed on the property * * * meant imposed over the objections of the property owner at the time of designation," which would apply to the Hanson property. However, based on its examination of the text, context, and legislative history of the statute, and applying statutory maxims of interpretation, LUBA then concluded that the phrase "a property owner" does not include "persons who become owners of the property after it is designated." Thus, because Hanson was not the property owner at the time of its historic designation, LUBA reversed the city's decision applying ORS 197.772(3) to her property. Hanson challenges LUBA's interpretation of the phrase "a property owner" in the statute. Thus, the question before us is whether the legislature intended subsection (3) to apply only to the property owner at the time of the historic designation, or whether it also intended that subsequent owners could remove a designation imposed on the property before their ownership.

We review LUBA's interpretation of ORS 197.772 to determine whether it is "unlawful in substance." ORS 197.850(9)(a); *Greenfield v. Multnomah County*, 259 Or App 687, 690, 317 P3d 274 (2013). In construing that statute, we apply the methodology set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993), *as modified by State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009), and "give primary weight to the text and context of the provision[s] in light of any legislative history that may be appropriately considered." *Greenfield*, 259 Or App at 698.

We have considered both the text and context of the statute, as well as the parties' arguments based on the text and context. In brief, we note that the legislature used the

term "*a* property owner," and not "*the* property owner," in subsection (3), which indicates generally that the universe of property owners was not necessarily circumscribed by the legislature. *See State v. Rodriguez*, 217 Or App 24, 30-31, 175 P3d 471 (2007) (citing *Carroll and Murphy*, 186 Or App 59, 68, 61 P3d 964 (2003), for the proposition that the legislature generally uses the indefinite article "a" to refer to an unidentified, undetermined, or unspecified object). However, the use of an indefinite, instead of a definite, article, in this instance, does not answer the precise question before us. Also, because post-enactment, subsection (1) ensures that property owners have a mechanism to prevent local designation, the contextual structure of the statute indicates that subsection (3) was meant to provide a mechanism for property owners to remove a designation placed on their property and over an owner's objection before enactment of ORS 197.772. Again, that context does not clarify whether the legislature intended that *subsequent owners* could use subsection (3) to remove a pre-enactment designation. Thus, the text and context of the subsection does not shed much light on the parties' particular dispute over the term "a property owner," and a lengthy discussion of the term in that regard would not be beneficial to the bench, bar, or the parties. However, the legislative history is helpful, so we focus our discussion on that history.

The issue of owner consent to a local historic designation was hotly contested in the committee work sessions on the section of the bill that became ORS 197.772 because it eliminated local government control. On May 2, 1995, the House Committee on General Government and Regulatory Reform met to consider Senate Bill (SB) 588.[9] At that work session, the representatives discussed several newly introduced amendments. Relevant to this case are the SB 588-A9 amendments and the A10 amendments. The A9 amendments eventually became ORS 197.772(3) and the

---

[9] SB 588 originated in the Senate and amended ORS 358.475 to 358.545, which allow property owners to apply for state classification and special assessment for historic property. Or Laws 1995, ch 693; SB 588 (1995) (A-engrossed). The House proposed amendments that added section 21 to SB 588, which eventually became ORS 197.772. Or Laws 1995, ch 693, § 21; House Committee on General Government and Regulatory Reform, May 2, 1995, Ex N (proposed A9 amendments), Ex O (proposed A10 amendments).

A10 amendments became ORS 197.772(1). Or Laws 1995, ch 693, § 21.

At the May 2, 1995, work session, Representative Lewis stated that the original intent in drafting the A9 amendments had been to allow "people who, since the implementation of the historic designation under Goal 5[,] *** have basically been coerced into the historic property designation" to use the mechanism under the A9 amendments to have the historic property designation removed. Tape Recording, House Committee on General Government and Regulatory Reform, SB 588, May 2, 1995, Tape 126, Side A (statement of Rep Lewis).

At the May 4, 1995, work session, the committee was split on the advisability of the A9 amendments, with those opposed expressing concern that the A9 amendments would "wreak havoc" on established local historic districts. *See* Tape Recording, House Committee on General Government and Regulatory Reform, SB 588, May 4, 1995, Tape 130, Side B (statement of Rep Johnston). The majority of the committee, however, adopted the A9 amendments as proposed. The committee then took up the A10 amendments and the following exchange occurred:

"[Rep. Johnston:] *** [C]ould somebody, as you understand this, consent under [A]10 and later ask to be out under [A]9?

"*****

"[Rep. Johnston:] *** I'm just trying to see how these things merge. I want to know if—[on] my number [A]10—we are granting a property owner the right to refuse to consent to any form of historic property—if they choose to. They could choose to agree. You know, I have a piece of property in downtown Ashland, and I decide to agree. And now I'm part of this historic district. Could I then, under the [A]9 we just [passed,] two years later decide to take it out?

"[Rep. Milne:] Representative Johnston, my intent in this amendment, where it says on line 3, 'historic property designation that was imposed on the property.' My feeling there is that what we're trying to say—what my intent is—*when property owners were not allowed to consent and*

*government imposed it on them, that now they would have an
opportunity to remove their property from that designation.*

"[Rep. Johnston:] Ok, let's call those Class A. So I
understand those. So, now, I'm talking about Class B. A
person who does it under section [A]10—had the opportu-
nity not to do it, went ahead and did it—can they, two years
later, under [A]9, take their property out?

"[Rep. Milne:] That was not my intent, Representative
Johnston.

"* * * * *

"[Chair Tiernan:] So, I guess once you put your prop-
erty in, it's in."

Tape Recording, House Committee on General Government
and Regulatory Reform, SB 588, May 4, 1995, Tape 130,
Side B (statements of Reps Johnston, Hayden, and Milne,
and Chair Tiernan) (emphasis added)). As that exchange
shows, the committee that added ORS 197.772(3) intended
that the amendments would allow individuals who own prop-
erty on which historic designations had been involuntarily
imposed by the local government—before the enactment of
ORS 197.772—to have that designation removed. However,
the committee also intended to limit that mechanism, so that
property owners who had consented to designation before
enactment, or not utilized the mechanism provided by subsec-
tion (1) to refuse consent after the enactment of ORS 197.772,
could not use subsection (3) to remove the designation.

The House passed SB 588 with the A9 and A10
amendments. The bill then went to a joint conference com-
mittee after the Senate refused to concur in the House ver-
sion, which resulted in additional amendments to the bill
which are not relevant here. Minutes, Joint Conference
Committee on SB 588, June 3, 1995. After that conference,
both the Senate and the House repassed SB 588. The text of
ORS 197.772(3) is the same as originally proposed in the A9
amendments. *See* House Committee on General Government
and Regulatory Reform, May 2, 1995, Ex N (proposed A9
amendments).

From that legislative history, we conclude that the
legislature intended to allow any property owner that had a

local historic designation forced on their property to remove that designation. The House Committee that adopted the A9 amendments did not contemplate that "a property owner" in subsection (3) would be limited to the property owner at time of the designation; instead, the committee was concerned with addressing, and rectifying, local government designations that had been "imposed" on property. Indeed, the A9 amendments' opponents were concerned that the amendments would lead to the dismantling of local historic districts, and the amendments' proponents did not assert otherwise in the face of those concerns, which supports the understanding that ORS 197.772(3) was intended to be broadly applicable. The legislature was thus focused on correcting impositions of unwanted designations, and not on the identity of the property owner that might be now stuck with that designation. And, the legislature did not include any narrowing text that would lead us to conclude otherwise. We thus conclude that Hanson, as the successor property owner to Wilmot, who objected to the original historic designation, is entitled to have that designation removed under ORS 197.772(3). Accordingly, we reverse LUBA's order.

Reversed on petition; affirmed on cross-petition.