No. 51 August 4, 2016 115

IN THE SUPREME COURT OF THE
STATE OF OREGON

LAKE OSWEGO PRESERVATION SOCIETY,
Marylou Colver,
and Erin O'Rurke-Meadors,
*Petitioners on Review,*

*v.*

CITY OF LAKE OSWEGO,
*Respondent on Review,*
*and*

Marjorie HANSON,
trustee for the Mary Cadwell Wilmot Trust.
*Respondent on Review.*

(LUBA No. 2014-009; CA A157619; SC S063048)

On review from the Court of Appeals.*

Argued and submitted November 10, 2015.

Daniel Kearns, Reeve Kearns PC, Portland, argued the cause and filed the briefs for the petitioners on review.

Christopher P. Koback, Hathaway Koback Connors LLP, Portland, argued the cause and filed the brief for the respondent on review, Marjorie Hanson.

No appearance on behalf of respondent on review City of Lake Oswego.

Carrie A. Richter, Garvey Schubert Barer, Portland, filed the brief for *amici curiae* Restore Oregon and Architectural Heritage Center, The National Trust for Historic Preservation, Preservation Action, Preservation Works, The City of Portland, The City of Pendleton, and The City of the Dalles. With her on the brief was Jennifer Bragar, Portland; Kathryn Beaumont, Portland Office of City Attorney, Portland for City of Portland; Gene E. Parker, Attorney

_____
  * Judicial review from the final order of the Land Use Board of Appeals. 268 Or App 811, 344 P3d 26 (2015).

for the City of The Dalles, The Dalles; and Nancy E. Kerns, Attorney for the City of Pendleton, Pendleton.

Inge D. Wells, Assistant Attorney General, Salem, filed the brief for *amici curiae* State Historic Preservation Office and Department of Land Conservation and Development. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Balmer, Chief Justice, Kistler, Walters, Landau, Baldwin, and Brewer, Justices.**

BALMER, C. J.

The decision of the Court of Appeals is reversed. The final order of the Land Use Board of Appeals is affirmed.

_____

** Linder, J., retired December 31, 2015, and did not participate in the decision of this case. Nakamoto, J., did not participate in the consideration or decision of this case.

**BALMER, C. J.**

This case concerns the interpretation of Oregon's historic property designation consent statute, ORS 197.772. That statute provides that the owners of properties slated for local historic designation have the right to refuse to consent to that designation. It also requires a local government to "allow a property owner to remove from the property a historic property designation that was imposed on the property by the local government." ORS 197.772(3). The owners of the property at issue here sought to remove it from the local government's list of historic landmarks, citing the removal provision in ORS 197.772(3). The local government concluded that it was required to grant the owners' request, but on appeal the Land Use Board of Appeals (LUBA) disagreed, concluding that the right to remove imposed designations does not apply to successors-in-interest like the owners in this case. *Lake Oswego Preservation Society v. City of Lake Oswego*, 70 Or LUBA 103, 121 (2014). The property owners sought judicial review and the Court of Appeals reversed, concluding that the legislature intended ORS 197.772 to confer on *all* property owners the right to remove local historic designations that were imposed on the property without the owner's consent. *Lake Oswego Preservation Society v. City of Lake Oswego*, 268 Or App 811, 820-21, 344 P3d 26 (2015).

The issue presented on review is thus a narrow one: If a local historic designation is imposed on a property and that property is then conveyed to another owner, may the successor remove that designation under ORS 197.772(3)? For the reasons explained below, we conclude that, although the legislature intended ORS 197.772(3) to provide a statutory remedy for certain owners whose property was designated as historic against their wishes, the legislature also intended that owners who acquired property after it had been designated would be bound by that designation and by any resulting restrictions on the use and development of that property. Accordingly, we agree with LUBA that the right to remove an historic designation under ORS 197.772(3) applies only to those persons who owned their properties at the time that the

designation was imposed and not to those who acquired them later, with the designation already in place. We therefore reverse the decision of the Court of Appeals and affirm LUBA's final order.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Since 1973, with the passage of Senate Bill (SB) 100, the system of land use planning and development in Oregon has been governed by a comprehensive statutory scheme. *See generally* Edward Sullivan, *Remarks to University of Oregon Symposium Marking the Twenty-Fifth Anniversary of S.B. 100*, 77 Or L Rev 813, 817-21 (1998) (describing development of Oregon's land use planning system under framework established by SB 100); *see also* Jennifer Johnson and Laurie Bennett, *Introduction: Oregon Land Use Symposium*, 14 Envtl L v, v-vi (1984) (describing SB 100 and its goal of replacing ad hoc local planning with "a unified statewide system"). Pursuant to that scheme, codified in ORS chapter 197, individual cities and counties across the state are responsible for adopting local comprehensive plans, zoning land, administering land use regulations, and handling land use permits, all in accordance with mandatory Statewide Planning Goals and Guidelines set by the Oregon Land Conservation and Development Commission (LCDC). *See* ORS 197.030-197.798 (setting out framework for development of Statewide Planning Goals and Guidelines, and obligations of local governments for implementation of those goals). Statewide Planning Goal 5 requires local governments to identify and designate historically significant properties, and where appropriate, protect those properties long-term by regulating their use and development. *See* OAR 660-015-0000, OAR 660-023-0000 - 660-023-0060, and OAR 660-023-0200 (setting out administrative rules under Goal 5 that govern identification and protection of historic properties).

The 1995 passage of the statute at issue in this case, ORS 197.772, created an anomaly in one part of that comprehensive system. Whereas the statewide scheme for land use planning and development under SB 100 requires local governments to utilize a holistic approach that balances a variety of considerations when making land use

planning decisions, ORS 197.772 specifically requires that with respect to local historic designations, property owners have the right to refuse a request to designate their property as historic, and in some cases, to remove historic designations already in place. Noting that fundamental inconsistency, petitioner, the Lake Oswego Preservation Society (LOPS), contends that the designation removal provision in that statute, set out in ORS 197.772(3), was intended to provide a specific remedy to a limited group of property owners and that in light of its broader statutory and regulatory context, we should interpret that provision narrowly in a way that preserves Oregon's well-established system under Goal 5 of designating and regulating historic properties in order to protect them from alteration or demolition. Respondent, the Mary Cadwell Wilmot Trust (the Trust)[1]—the owner of the property whose designation is at issue here—argues that the effect of ORS 197.772(3) was intended to be more fundamental and that, as a result of that provision, any owner of a property upon which an historic designation was imposed may remove that designation, and any accompanying land use restrictions, at any time, regardless of whether that owner acquired the property decades later and with the designation already in place.

A.  *The Designation of the Carman House*

To determine what the legislature intended when it enacted ORS 197.772(3), we begin with the background of the property at issue. We take the facts from the record before the City of Lake Oswego, which made the designation here. Located in Lake Oswego, the property was originally part of a pioneer homestead, created by one of the first Donation Land Claim grants in the state. The main structure on the property, the Carman House, was built circa 1856. Because the Carman House and the lot on which it sits have been subject to relatively few modifications, the property is considered a rare and valuable example of a territorial Oregon residence.

---

[1] Marjorie Hanson, as trustee for the Mary Cadwell Wilmot Trust, is the named party in this case. For current purposes of clarity, we refer throughout this opinion to her and the trust that owns the Carman House collectively as "the Trust."

The issue of the property's status as an historic landmark first arose in the late 1980s, when the city of Lake Oswego began developing its inventory of local historic properties as required by Goal 5 of Oregon's land use planning scheme. *See* Terence Thatcher and Nancy Duhnkrack, *Goal Five: The Orphan Child of Oregon Land Use Planning*, 14 Envtl L 713, 715-20 (1984) (describing requirement under Goal 5 that local governments inventory resources, identify conflicting uses, and implement appropriate protective measures). As a result of that inventory review, the city determined that the Carman House and the property immediately surrounding it constituted an historic "farm complex" under the city's Historic Resource Protection Plan (1989) and that it should be designated as a landmark under the city's municipal code. In 1990, as a result of that determination, both the lot containing the Carman House and an adjoining parcel of land were added to the city's Landmark Designation List and, as a consequence, became subject to certain restrictions on their use and development pursuant to the city's local historic preservation ordinance.[2] *See* Lake Oswego Municipal Code (LOC) 58.020 - 58.135 (1990) (setting out limitations on demolition, moving, or exterior alteration of properties on Landmark Designation List).

At the time, the city could designate a property as historic, and subject it to special land use requirements, without the property owner's consent. *See* LOC 58.025 (1990) (describing authority and process for designating properties); *see also DLCD v. Yamhill County*, 99 Or App 441, 445-47, 783 P2d 16 (1989) (holding that local historic designations could not be contingent on owner preference). A property owner did have the right to be notified of the city's decision to designate a property, however, and could challenge that decision through a quasi-judicial post-designation process. LOC 58.025 (1990). Using that mechanism, in 1990, Richard Wilmot,[3] one of the owners of the

---

[2] Although the Carman House is not listed on the National Register of Historic Places, the city of Lake Oswego has previously determined that it is eligible to be listed, given its age, integrity, and historic significance.

[3] Wilmot, the great-grandson of Waters Carman, the original settler who established the homestead, acquired the Carman House with his wife, Mary Wilmot, in 1978.

Carman House at that time, objected to the historic farm complex designation. Wilmot argued that the designation was improper for several reasons, including that the city had failed to account adequately for the economic impact of designation and that it should have considered the Carman House separately from the adjoining parcel that it had included as part of the historic farm complex.[4] In the alternative, Wilmot argued that because only the Carman House had historic value, any landmark designation should be limited to the house and a smaller parcel of land immediately surrounding it.

In 1991, while litigation regarding the farm complex designation was still ongoing, an old barn situated on the adjoining parcel burned down. Because of that change in the property, the site no longer qualified as an historic farm complex as defined in the city's Resource Protection Plan. The city withdrew its prior decision and, in 1992, initiated a new hearing process to reconsider whether there were grounds for listing either property as an historic landmark on its own. Following the recommendations of its Historic Resource Advisory Board, the city concluded that the adjoining parcel lacked sufficient historic value on its own to warrant designation and removed it from the Landmark Designation List. The city determined, however, that the Carman House remained a valuable resource worthy of preservation. As a result, it ordered in July 1992 that the historic designation be retained on the Carman House. Despite his earlier objections, Wilmot did not challenge the city's decision on reconsideration. Rather, as noted by the city in its final account of the proceedings, no party contested the historic significance of the Carman House nor

---

[4] The Wilmots originally acquired the Carman House as part of a larger 10-acre parcel, which, at the time, made up the remainder of the family homestead. The Wilmots sold off most of that property in 1979, but retained the 1.25-acre plot on which the Carman House is situated. In 1990, when the Carman House was first designated as historic, the city designated the whole of the original 10-acre parcel—including both the Wilmots' property with the Carman House and the portion that they had sold—together as a single historic "farm complex." At that time, Wilmot objected to the historic designation of his property in concert with the purchaser of the property he had sold. It appears that their joint objection was motivated by the purchaser's desire to develop an assisted living facility on that land.

argued that the Wilmots' property should be removed from the Landmark Designation List.

Not long after the city decided to retain the Carman House on its historic landmark list, the Oregon legislature passed a variety of measures relating to the protection of historic properties under the state's comprehensive planning scheme. One of those measures, enacted in 1995, established the owner consent requirements for local historic designations that are at issue here. *See* Or Laws 1995, ch 693, § 21, *codified as* ORS 197.772. That law provided that local governments must allow "a property owner" whose property is under consideration for local historic designation to refuse the designation. ORS 197.772(1). It also included a removal provision for properties already designated, which provided that "a property owner" may "remove from the property a historic property designation that was imposed on the property by the local government." ORS 197.772(3). Despite objecting to the city's designation of his property in 1990, Wilmot never sought the removal of the historic farmhouse designation under ORS 197.772(3) or by any other mechanism. As a result, the Carman House was still on Lake Oswego's Landmark Designation List when, in 2001, Mary Wilmot conveyed the property by warranty deed to Richard Wilmot II (Richard and Mary Wilmot's son), as trustee of the Mary Cadwell Wilmot Trust.

## B.  *The Trust Seeks the Removal of the Historic Designation*

In 2013, the Trust began its effort to remove the historic designation from the Carman House property in order to facilitate its subdivision and redevelopment. Although the city's Historic Resource Advisory Board initially denied that request, the City Council, following a public hearing on the issue, overturned that decision. In its written opinion, the City Council concluded that the right to remove a local historic designation under ORS 197.772(3) applies to any owner of a property on which an historic designation was "imposed." The City Council stated its view that because the designation was "imposed" on the Carman House in 1990, its present owners were entitled by law to remove it from the city's Landmark Designation List. Accordingly, the city approved the Trust's request.

LOPS appealed the city's decision to LUBA. Considering the text, context and legislative history of ORS 197.772(3), LUBA concluded that the City Council had erroneously interpreted that provision. Focusing on the meaning of the phrase "a property owner," LUBA concluded that that term as used in ORS 197.772(3) was not intended to include persons who become owners of a property after it is designated as historic. *Lake Oswego Preservation Society*, 70 Or LUBA at 121. Accordingly, because the Trust did not acquire the Carman House property until years after it had been designated as historic by the city, LUBA reversed the city's decision to remove the historic designation from the Carman House under ORS 197.772(3) and remanded the case to allow the city to determine whether the Trust could seek its removal under an alternative provision of the city's historic preservation law. *Id.* at 124-25.

C.   *The Court of Appeals Decision*

The Trust sought judicial review of LUBA's order, and the Court of Appeals reversed. *Lake Oswego Preservation Society*, 268 Or App at 821. The Court of Appeals agreed with LUBA that the decisive issue was the meaning of the phrase "a property owner" in ORS 197.772(3) and whether it encompasses all owners of historic properties or only those who owned the property at the time the designation was imposed. As to that issue, however, the court disagreed with LUBA's interpretation of the statute. Looking first to the text, the court noted that the indefinite article "a" ordinarily refers to an "unidentified, undetermined or unspecified" object. *Id.* at 817-18. Next, considering the legislative history of ORS 197.772(3), the court found nothing expressly indicating that the legislature intended to *exclude* successors-in-interest from utilizing the removal provision in ORS 197.772(3), and some evidence that the legislature was aware that allowing owners to remove designations might undermine local historic districts. *Id.* at 818-21. Based on that history, the court concluded that the legislature was "focused on correcting impositions of unwanted designations, and not on the identity of the property owner that might be stuck with that designation." *Id.* at 821. Accordingly, the court held that the best reading of that provision was the broadest one: that

*any* owner of a property on which a local historic designation was, or had been, "imposed" has a right to remove it, regardless of whether that designation was already in place when the owner took title. *Id.* We granted LOPS's petition for review to address the meaning and application of ORS 197.772(3).

## II.   ANALYSIS

Our goal in interpreting statutes is to discern, to the extent possible, what the legislature intended a provision to mean. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We examine the statutory text in context, along with its legislative history, applying as needed relevant rules and canons of construction. *Id.* For the reasons described below, we conclude that the legislature most likely intended the phrase "a property owner" in ORS 197.772(3) to refer only to persons who owned a property at the time a local historic designation was imposed on that property.

A.   *Statutory Text*

ORS 197.772 provides:

"(1)   Notwithstanding any other provision of law, a local government shall allow a property owner to refuse to consent to any form of historic property designation at any point during the designation process. Such refusal to consent shall remove the property from any form of consideration for historic property designation under ORS 358.480 to 358.545 or other law except for consideration or nomination to the National Register of Historic Places pursuant to the National Historic Preservation Act of 1966, as amended (16 U.S.C. 470 et seq.).

"(2)   No permit for the demolition or modification of property removed from consideration for historic property designation under subsection (1) of this section shall be issued during the 120-day period following the date of the property owner's refusal to consent.

"(3)   A local government shall allow a property owner to remove from the property a historic property designation that was imposed on the property by the local government."

ORS 197.772.[5] The statutory text thus has two substantive components. The first part, in subsections (1) and (2), relates to a property owner's right to refuse a local historic designation during the initial designation process, and the effects of such a refusal. The second part, in subsection (3), relates to the status of properties already designated as historic and requires a local government to allow the removal of a designation from a property when two conditions are met. First, the party seeking removal must be "a property owner" within the meaning of the statute. Second, the property must have had the historic property designation "imposed" on it by the local government.[6]

The issue, as noted, is whether the phrase "a property owner" in ORS 197.772(3) refers only to the owner of the property at the time that an historic designation was imposed, or whether *any* owner, such that a successor-in-interest, like the Trust, may utilize it also.[7]

Because none of the terms in ORS 197.772 are defined in the statute, we look first to their ordinary meanings to determine what the legislature meant. *State v.*

---

[5] ORS 197.772 has been amended since it was first enacted in 1995. *See* Or Laws 2001, ch 540, § 19 (updating cross-reference to renumbered statute in subsection (1)). Because that amendment is not pertinent to any of the issues before us on review, we quote the current version of the text.

[6] The meaning of the word "imposed" in ORS 197.772(3) is also a matter of first impression before this court. LUBA has interpreted it to mean that the historic designation was put in place over the objections of the property owner at the time of designation. *See Demlow v. City of Hillsboro*, 39 Or LUBA 307, 314-17 (2001) (interpreting and defining term). Because the only question on review is whether the term "a property owner" in ORS 197.772(3) includes a successor-in-interest, and because the resolution of that question is dispositive in this case, we leave for another day the issue of what the legislature meant in requiring that a designation be "imposed" for it to be subject to removal under ORS 197.772(3).

[7] The Trust has suggested that it should not be considered a successor-in-interest to the Wilmots because it was created by them as an estate planning vehicle. Because the Court of Appeals resolved this case on other grounds, it did not reach that issue. A trust is a distinct legal entity, and a settlor's transfer of property to a trust divests the settlor of its legal interest in that property. *Restatement (Third) of Trusts* § 2 comment a, and § 3 comment b (2003). In this case, the record shows that Mary Wilmot conveyed the property in 2001 by warranty deed to Richard Wilmot II, as trustee of the Mary Cadwell Wilmot Trust. On those facts, we treat Mary Wilmot's transfer of the property the same as any conveyance of real property. We express no opinion, however, on whether under other circumstances an original owner's right to remove a designation under ORS 197.772(3) may be exercised by a different person or entity.

*Dickerson*, 356 Or 822, 829, 345 P3d 447 (2015). The words "property" and "owner" are relatively straightforward, referring, in context, to the individual or entity that has legal title to a piece of real estate. *See Webster's Third New Int'l Dictionary* 1818, 1612 (unabridged ed 2002) (defining "property" and "owner"). However, those definitions do not tell us *which* property owners the text refers to.

Urging us to interpret the term "a property owner" in its broadest possible sense, the Trust emphasizes the fact that the legislature chose to use the indefinite article "a" as a determiner rather than the definite article "the" in that phrase. That word choice, the Trust suggests, unambiguously shows that the legislature intended ORS 197.772(3) to apply to *all* property owners, including successors-in-interest like the Trust.

We do not find the legislature's word choice to be so conclusive. In some cases, statutory text that appears clear on its face turns out, upon closer analysis, to be entirely uncertain. *See Gaines*, 346 Or at 172 (legislative history may establish that "superficially clear language actually is not so plain at all—that is, that there is a kind of latent ambiguity in the statute"). For the reasons discussed below, the text in this case is susceptible to at least two plausible interpretations.

The Trust argues that the phrase "a property owner" in ORS 197.772(3) means *any* property owner at any point in time, including those who acquired the property after the designation was imposed. However, as a basic principle of grammar, that is not necessarily the case. On one hand, it is true that the indefinite article "a" is often used as a function word before a singular noun when that noun is "undetermined, unidentified, or unspecified, esp. when the individual is being first mentioned or called to notice." *Webster's* at 1; *see also* Randolph Quirk et al, *A Comprehensive Grammar of the English Language* at 272 (1985) (indefinite articles normally used when referenced noun is not uniquely identifiable in shared knowledge of speaker and hearer). When used in that context, the word "a" is sometimes synonymous with "any." *See, e.g.*, *State v. Hankins*, 342 Or 258, 263, 151 P3d 149 (2007) (use of indefinite article "an" in statute could

mean defendant is permitted to demur to indictment when facts alleged do not constitute *any* offense); *see also, e.g.*, *Carroll and Murphy*, 186 Or App 59, 68, 61 P3d 964 (2003) (distinguishing definite article "the" from indefinite article "a"; the latter could indicate *any* future payment as opposed to a specific one).

On the other hand, the use of the article "a" as a determiner does not always mean that the referenced noun is unspecified in the most generic sense. For example, "a" may also be used quantitatively. *See Webster's* at 1 ("a" may be used "to suggest a limitation in number"). As a result, "a" may simply signal that the specified noun is one of a particular class, whether that class is defined by a subsequent restrictive clause or other modifier, *id.*, or is implied more generally by the context in which the phrase appears. *See* Rodney Huddleston *et al*, *The Cambridge Grammar of the English Language* 371-72 (2002) (describing uses of indefinite article "a" and difference between quantitative and non-quantitative indefiniteness). When used in that manner, the determiner "a" indicates that the noun that follows is one unspecified member of a limited group. *See, e.g.*, *Hankins*, 342 Or at 263 (legislature's use of indefinite article in statute permits two interpretations: that demurrer is permitted only when the facts stated do not constitute "any" offense, or when indictment simply fails to state the offense that it purports to charge). Read in that way, the phrase "a property owner" in ORS 197.772(3) could also be interpreted as referring to one of an otherwise limited group of property owners.

Viewing the text of ORS 197.772(3) in context, the latter interpretation is entirely plausible. *See Gaines*, 346 Or at 171 (to make sense of what a particular provision means, we must consider the text in light of the context in which it appears). One important source of context is other parts of the same statute. *Dept. of Transportation v. Stallcup*, 341 Or 93, 99, 138 P3d 9 (2006). In this case, the legislature used the same term—"a property owner"—in both subsections (1) and (3) of ORS 197.772. "When the legislature uses the identical phrase in related statutory provisions that were enacted as part of the same law, we interpret the phrase to

have the same meaning in both sections." *Tharp v. PSRB*, 338 Or 413, 422, 110 P3d 103 (2005).

Here, the legislature's use of the same phrase in subsection (1) supports LOPS's interpretation of ORS 197.772(3). Unlike subsection (3), the text of subsection (1) contains several indications of whom the phrase "a property owner" refers to. ORS 197.772(1) provides in part:

> "Notwithstanding any other provision of law, a local government shall allow *a property owner* to refuse to consent to any form of historic property designation at any point during the designation process."

(Emphasis added.) Because the word "designation" refers in that sense to an event—the action of designating—the class of property owners referred to in subsection (1) is limited temporally to those at that particular point in time. That limitation is confirmed by the restrictive clause in the same sentence, specifying that "a property owner" may only exercise its refusal right under subsection (1) "during the designation process." The phrase "a property owner" in subsection (1), therefore, refers to a specific and relatively narrow class of owners: those who own a property at the time that the government designates that property as historic. If the same meaning is applied to the phrase "a property owner" in subsection (3), that provision becomes similarly targeted, referring to an owner at the time a property is first designated, whenever that occurs. Thus, although the legislature's use of the same term in ORS 197.772(1) does not foreclose the Trust's interpretation of ORS 197.772(3), it highlights the fact that when read in context, the meaning of the phrase "a property owner" is ambiguous.[8]

The Trust contends, nonetheless, that the text of ORS 197.772(3), taken as a whole, requires us to adopt a more expansive reading of the term "a property owner."

---

[8] The Trust argues that the term "a property owner" cannot have the same meaning in both subsections of ORS 197.772, noting that subsection (1) and subsection (2) may refer to designations occurring at different points in time—before and after the enactment of ORS 197.772. That argument is not well taken. Although ORS 197.772(1), like most statutes, is written to apply prospectively and ORS 197.772(3) is remedial, both provisions can be readily interpreted as applying to the same group of owners: those who own a property at the time it is designated.

To reach that result, the Trust draws a negative inference from the legislature's failure to more specifically describe or explain what it intended the term "a property owner" to mean in ORS 197.772(3). For, the Trust argues, had the legislature intended that provision to apply to only certain property owners, it would have included additional language clarifying that point, stating, for example, "that the owner who owned the property at the time a designation was imposed may seek removal."

We do not find that argument persuasive. As we have previously recognized, the fact that a statutory provision describes something in relatively broad terms does not always mean that the legislature intended the most expansive meaning possible. *See* *State v. Walker*, 356 Or 4, 17, 333 P3d 316 (2014) (where there is evidence legislature had a more specific meaning in mind and that meaning is consistent with the text, court may appropriately construe text as such even if it also permits more expansive interpretation); *see, e.g.*, *Alfieri v. Solomon*, 358 Or 383, 401-02, 365 P3d 99 (2015) (concluding that legislature, despite use of passive voice in statute, did not intend it to apply to any person, but only to determinate class). Moreover, because legislative inaction can stem from a variety of causes, which may or may not relate to the legislature's intent as to a particular issue, negative inferences based on legislative silence are often unhelpful in statutory interpretation. *See, e.g.*, *Farmers Ins. Co. v. Mowry*, 350 Or 686, 696, 261 P3d 1 (2011) (noting that legislative silence is a "legal fiction" and that the legislature "may decline to address a judicial decision for any number of reasons, none of which necessarily constitutes an endorsement of the decision's reasoning or result"); *see also State Bar v. Security Escrows, Inc.*, 233 Or 80, 84-85, 377 P2d 334 (1962) (finding "no authority for the proposition that legislative silence * * * is the equivalent of a legislative definition").

Whereas the absence of narrowing language in ORS 197.772(3) could mean that the legislature intended that provision to be read in an expansive sense, an equally plausible inference is that the omission means nothing at all, except that the legislature did not perceive the need to

clarify its intent. *See State v. Rainoldi*, 351 Or 486, 492, 268 P3d 568 (2011) (noting that because fact of legislative silence can give rise to competing inferences—that legislature did not intend anything in particular, or that the omission was purposeful—it is generally not a dispositive indicator of intent). Thus, although "[t]he legislature knows how to include qualifying language in a statute when it wants to do so," *PGE v. Bureau of Labor and Industries*, 317 Or 606, 614, 859 P2d 1143 (1993), the fact that the legislature failed to do so in a particular case is far from definitive proof of its intent.

In sum, the text of ORS 197.772(3) does not, on its own, compel any particular interpretation of the term "a property owner." Although the use of the indefinite article "a" in that provision could be read as synonymous with "any," there is at least one other plausible way in which to read the same words. That variation highlights the fact that, while grammatical "rules" are helpful in statutory interpretation, they are often subject to qualification and should not be applied mechanically in seeking to discern the meaning of a provision. Rather, because the legislature sometimes expresses itself in unusual ways, the best reading of a statute is not necessarily the most obvious one, grammatically speaking. *See, e.g., Burke v. DLCD*, 352 Or 428, 435-37, 290 P3d 790 (2012) (describing variations in use of disjunctive "or" and concluding that while it often indicates an exclusive relationship, legislature may also use "or" inclusively). That is particularly true when, as discussed below, the broader context of a provision points to a different meaning than the text, read in isolation, might otherwise suggest.

B.   *Legislative and Regulatory Context*

ORS 197.772(3) was drafted against the backdrop of a well-developed set of related statutes and rules concerning the preservation of historic properties and was intended to change one aspect of that regulatory scheme. *See Stallcup*, 341 Or at 99 (relevant context includes other related statutes, preexisting common law, as well as regulatory framework); *Blachana, LLC v. Bureau of Labor and Industries*, 354 Or 676, 691, 318 P3d 735 (2014) (for purposes of statutory interpretation, "[w]e presume that the legislature was aware of existing law"). *See also* Tape Recording,

Senate Committee on Water and Land Use, SB 588, Mar 22, 1995, Tape 66, Side A (discussion between Sen Johnson and Sen Dwyer and various witnesses regarding existing historic preservation programs and effect of proposed consent provision on those programs); Tape Recording, House Committee on General Government and Regulatory Reform, SB 588, May 2, 1995, Tape 126, Side A (statement of Rep Leslie Lewis that consent provision was specifically intended to address designation of properties by local governments pursuant to Goal 5). For the reasons discussed below, we conclude that legislative and regulatory context supports the interpretation of ORS 197.772(3) as being limited to the relatively small group of property owners whose property was designated as historic against their wishes, rather than to all owners of designated properties, including subsequent purchasers.

A central aspect of that context, and one particularly pertinent here, was the requirement, as part of Oregon's comprehensive land use planning process, that local governments create and implement comprehensive development plans and local land use regulations to protect historically significant properties. *See 1000 Friends v. LCDC*, 292 Or 735, 744-50, 642 P2d 1158 (1982) (describing development and organization of statewide land use planning framework under ORS chapter 197); *see also* Land Conservation and Development Commission (LCDC), *Oregon's Statewide Planning Goals: Goal 5* (1990) (describing basic content of goal relating to historic preservation).[9]

As noted above, pursuant to Statewide Planning Goal 5, local governments were required to inventory all historic properties, analyze the potential uses and conflicts

---

[9] Although the Goal 5 framework is largely made up of agency guidelines and administrative rules, and therefore is not a direct expression of legislative intent, it nonetheless informs the legal background against which the legislature acted when it created ORS 197.772. *See State v. Lane*, 357 Or 619, 624-31, 355 P3d 914 (2015) (considering administrative rules in form of sentencing guidelines as part of legal context for constitutional amendment relating to judicial power to modify criminal sentences). The administrative rules that govern the application of Goal 5 today, OAR 660-015-0000 and OAR 660-023-0000 to 660-023-0250, were not created until 1996. Therefore, for purposes of examining the regulatory context that existed when ORS 197.772(3) was enacted, we look to the guidelines and rules in effect at that time, those promulgated in 1990.

as to the use of those properties, and adopt measures, usually in the form of local land use ordinances, to ensure that those properties were appropriately protected in light of economic, social, environmental, and energy considerations. *See Statewide Planning Goals* at 6-7 (establishing procedures and criteria for inventorying and evaluating Goal 5 resources and for developing local land use programs to conserve and protect those resources); *see also Collins v. LCDC*, 75 Or App 517, 520-24, 707 P2d 599 (1985) (describing process for developing and implementing appropriate land use restrictions pursuant to Goal 5). Thus, in implementing Goal 5, local governments were obligated to not only identify historically significant properties, but also to ensure that those properties would be preserved for future generations. *See, e.g.*, *Statewide Planning Goals* at 6 (describing goal that historic areas, sites and structures shall be managed so as to preserve their original character). It was pursuant to that process that the Carman House was identified, added to the city of Lake Oswego's Landmark Designation List, and made subject to certain land use restrictions.

One of the defining features of the Goal 5 program, and the feature of greatest concern to legislators when they revisited the issue in 1995, was that the process for designating properties was largely involuntary from the property owner's standpoint. Tape Recording, Senate Committee on Water and Land Use, SB 588, Mar 22, 1995, Tape 66, Side A (testimony of James Hamrick, State Preservation Office, describing program). At that time, the determinative consideration for whether a property would be included on a local inventory was not whether the owner consented, but whether it qualified as an historic resource according to a set of specified criteria. *Yamhill County*, 99 Or App at 446-47; *see also, e.g.*, LOC 58.095 - 58.105 (1990) (setting out criteria for historic designations). Although owners ordinarily had some opportunity to provide input in the designation process, the ultimate decision as to whether a property would be designated was up to the local government, following the process set at the state level under Goal 5. *See Yamhill County*, 99 Or App at 446-47 (holding that state law requires local governments to consider a variety of specified factors in determining whether to designate an historic

property and that county ordinance that made owner consent a prerequisite to designation was invalid under Goal 5 because it "categorically subordinate[d]" those many factors to the owner's preference).

As in other states, Oregon's approach to historic preservation included proactively identifying and designating properties as a precursor to the application of general restrictions on use and development.[10] That approach was considered beneficial to historic preservation goals because it allowed local governments to create more comprehensive inventories and avoid the inadvertent loss of important resources, as sometimes happens when preservation takes place in a piece-meal fashion. *See* David Listokin, *Growth Management and Historic Preservation: Best Practices for Synthesis*, 29 Urb Law 199, 204-06 (1997) (describing value of addressing historic preservation as part of comprehensive planning approach and importance of identifying historic resources); *see also* Paul Wilson and James Winkler II, *The Response of State Legislation to Historic Preservation*, 36 Law & Contemp Probs 329, 333-35, 337-39 (1971) (identifying features and benefits of historic designation in various jurisdictions).

That approach to historic preservation also had the benefit of ensuring long-term stability. Once a property was designated as historic, it ordinarily remained so, regardless of any future owner's preference, as long as it continued to meet the specified criteria for designation. *See* Julia Miller, *Owner Consent Provisions in Historical Preservation Ordinances: Are They Legal?*, 10 Preservation L Rep 1019, 1023-24 (1991) (describing how local historic designation should work and noting that once a designation attaches, it will typically run with the property, and apply to subsequent owners); *see also, e.g.*, LOC 58.110

---

[10] Oregon's system for historic preservation at the local level pursuant to Goal 5 is not unique, but typical of programs found in jurisdictions across the country. *See* David Listokin, *Growth Management and Historic Preservation*, 29 Urb Law 199, 202-03 (1997) (describing Oregon system for historic preservation and comparing to others elsewhere in United States); *see, e.g., Penn Cent. Transp. Co. v. City of New York*, 438 US 104, 109-14, 98 S Ct 2646, 57 L Ed 2d 631 (1978) (describing comparable program in New York City and noting that it is typical of many urban landmark laws).

(1990) (stating that for designation to be removed, city must determine that it is no longer justified pursuant to same criteria that governs designation); Portland City Code (PCC) 33.845.070 (1991), *repealed and renumbered by* Portland City Ordinance No. 169987 (Apr 10, 1996) (specifying that historic landmark designation will only be removed if reasons for designating property no longer apply). And because the designation of a property would trigger the application of legal protections restricting its use and development—typically in the form of local land use ordinances and zoning plans—designated historic properties had the benefit of long-term protection from alteration or demolition. *See* Julian Juergensmeyer and Thomas Roberts, *Land Use Development Regulation Law* § 12:8 (3d ed 2013) (describing how local historic designation programs, like that under Goal 5, use regulations to protect historic properties); *see, e.g.*, LOC 58.020, 58.120 - 58.145 (1990) (setting out land use restrictions applicable to all designated properties); Eugene City Code (ECC) 9.206 - 9.208 (1992) (providing that designated historic landmarks shall be subject to special zoning overlay and restrictions on alteration and development of property).

The downside of that approach, however, was that the imposition of an historic designation could interfere with the investment-based expectations of the owner who suddenly became subject to restrictions on the use and enjoyment of its property. *See* Sara Bronin and J. Peter Byrne, *Historic Preservation Law* 78-79 (2012) (local historic designations typically trigger restrictions on owner's rights as to use of property); *cf. Penn Cent. Transp. Co. v. City of New York*, 438 US 104, 1264-25, 98 S Ct 2646, 57 L Ed 2d 631 (1978) (owner's investment-based expectations are relevant to whether restriction on property's use under local historic preservation ordinance impinged on property owner's rights). Although historic preservation might bolster property values at an aggregate level over time, historic designation could diminish an individual property's fair market value. *See* Paul Asabere *et al*, *The Adverse Impacts of Local Historic Designation: The Case of Small Apartment Buildings in Philadelphia*, 8 J Real Estate Finance and Economics 225, 227, 232 (1994) (describing effect). And

even when that was not the case, designation could present a financial burden in other ways, by, for example, prohibiting the most profitable use of a property or creating onerous maintenance requirements. *See Penn Cent. Transp. Co.*, 438 US at 130 (noting that in that case, ordinance prohibited most beneficial use of property to owner by limiting owner's ability to develop 55-story building on site); *see also, e.g.*, ECC 9.208 - 9.210 (1992) (restricting alterations to building exteriors; requiring repair rather than replacement of existing architectural features and that repairs accurately duplicate original designs).

Thus, while Oregon's system of designating and regulating historic properties under Goal 5 was similar to other land use planning in that it elevated certain public interests over individual landowner preferences, it tended to impose the costs of those benefits to an even greater extent on specific landowners. *Cf. Penn Cent. Transp. Co.*, 438 US at 139 (Rehnquist, J., dissenting) (arguing that same type of preservation program "imposes * * * a substantial cost, with little or no offsetting benefit except for the honor of the designation" and questioning whether that cost ought to be borne by all taxpayers instead of by individual owners). As one author aptly described the problem:

> "Since landmark designation usually imposes restrictions on the owner's alterations of the property, an owner may be forced to bear the burden of diminished property value and in effect to pay for the community's preservation preferences through an assessment not placed on the owners of ordinary properties. To be sure, landmark designation may provide some benefits to some landmark owners * * *. But for the owner who resists landmark designation and control, the burden probably outweighs the benefits."

Carol Rose, *Preservation and Community: New Directions in the Law of Historic Preservation*, 33 Stan L Rev 473, 497-98 (1981). *See also* Joseph Sax, *Some Thoughts on the Decline of Private Property*, 58 Wash L Rev 481, 483 (1983) (discussing criticism that designation and regulation of historic properties forces owners to bestow amenities on their neighbors without any reciprocal obligation); Andrew Gold, *The Welfare Economics of Historic*

*Preservation*, 8 Conn L Rev 348, 363-67 (1976) (describing economic cost of individual landmark designation and how it is distributed).

For those reasons, some viewed the imposition of an historic designation over a property owner's objections as a violation of that owner's property rights. *See* Tape Recording, House Committee on General Government and Regulatory Reform, May 2, 1995, SB 588, Tape 127, Side A (statement of Larry George, Oregonians in Action, explaining reasons for supporting owner consent provision under Oregon law). Indeed, Congress amended the National Historic Preservation Act in 1980 to require owner consent for individual properties to be designated and listed as landmarks on the National Register of Historic Places in part to address similar concerns. *See W. Hartford Initiative to Save Historic Prop. v. Town of W. Hartford*, No. 3:06-CV-739 (RNC), 2006 WL 2401441 at \*6 (D Conn Aug 18, 2006) (describing legislative history of National Historic Preservation Act and creation of owner consent requirement).[11]

That background helps frame several of the parties' arguments over the proper interpretation of the removal provision in ORS 197.772(3). Pointing to the comprehensive nature of Oregon's statewide historic preservation program under Goal 5 and the many benefits of that system, LOPS and *amici* argue that that context strongly undercuts any interpretation of ORS 197.772(3) that would allow subsequent owners to use that provision to unilaterally opt out of designation decades later. They contend that because the overwhelming majority of historically significant properties in Oregon were designated before ORS 197.772 was enacted in 1995, and therefore likely had designations put

---

[11] Although the listing of a property on the National Register is primarily honorific and does not directly result in any restriction on the owner's control and use of the property, the federal listing of a property often triggers a variety of restrictions under state and local law. Bronin, *Historic Preservation Law* at 68-69. It was partly for that reason, and to alleviate due process concerns that might result, that Congress added the owner consent requirement for individual landmark listings. *W. Hartford Initiative to Save Historic Prop. v. Town of W. Hartford*, No. 3:06-CV-739 (RNC), 2006 WL 2401441 at \*6 (D Conn Aug 18, 2006); *see also* Juergensmeyer and Roberts, *Land Use Planning and Development Regulation Law* at 12:8 (describing issue of owner consent and addition of owner consent provision to National Historic Preservation Act).

in place regardless of their owners' desires at the time, creating a removal right that would run to successors-in-interest would fundamentally and permanently destabilize the entire system of historic preservation in Oregon. Most of the state's historic properties would be perpetually at risk of being de-listed and, thus, subject to modification or demolition with little warning and no consideration of the broader impact of that decision.

        Acknowledging that impact, the Trust responds that because the text of ORS 197.772(3) is inherently at odds with Goal 5, the only way to interpret that provision is as a substantial abrogation of that program. The Trust is certainly correct that the owner consent provisions in ORS 197.772 were intended to modify the existing process for historic designation and regulation under Goal 5. Giving property owners the power to refuse designation not only makes it more difficult for local governments to designate properties, it also gives an owner—at least the owner at the time of designation—rights that would elevate the owner's preference above other factors that would otherwise inform the Goal 5 process. *See Yamhill County*, 99 Or App at 447 (concluding that owner consent requirement "categorically subordinate[d] all historic resources, or at least all otherwise qualified landmarks, to any owner's preference for non-regulation"). Likewise, allowing individual owners to refuse designation makes historic inventories less comprehensive and the preservation of historic properties less complete, reducing the value of such programs. *See* Miller, *Owner Consent Provisions* at 1020-21, 1035-36 (describing how owner consent provisions "seriously limit the ability of local governments to fulfill the mandate to protect historic property and the heritage of their citizenry" and "undermine the general principle that regulation should be rationally and uniformly applied").

        The mere fact that ORS 197.772 is in tension with Goal 5, however, does not answer the question of how far the legislature intended to go in cutting back the scope of existing local preservation programs created pursuant to that goal, or the extent to which the legislature intended to limit

the effect of historic designations that were already in place. Rather, even if the right to refuse consent in ORS 197.772(1) decreases the number of new designations, the impact of the removal right in ORS 197.772(3) on existing designations and preservation programs depends in substantial part on how one reads that provision. If one interprets the right to remove an historic designation as applying to *any* owner of a property on which a designation was ever "imposed," the result could be, as LOPS contends, that most, if not all, of Oregon's historic properties are at risk of having their designations, and the protections that accompany that status, removed at any time. If, however, the right to remove a designation applies only to those owners who owned their properties at the time of designation, the long-term impact of ORS 197.772(3) is more limited. Although some of those owners may still opt out, the number of properties eligible for de-listing is smaller and would tend to decrease over time as historic properties change hands.

Contrary to the Trust's assertions, nothing about the context of ORS 197.772(3) suggests that the legislature intended to eliminate local governments' use of historic designations to protect and preserve historic properties long-term and therefore meet their obligations under Goal 5. Rather, what that context shows is that the legislature sought to adjust that existing framework to strike a more equitable balance between the countervailing interests of historic preservation and property rights. For example, even as the legislature sought to provide an additional right to some owners, it tempered that objective by including within the same statute a provision aimed at ensuring local communities every opportunity to save historically important properties prior to their demolition or alteration. *See* ORS 197.772(2) (establishing mandatory delay period following refusal to consent to designation during which demolition or significant alternation is prohibited, in order to facilitate alternative means of preservation); *see also* Tape Recording, House Committee on General Government and Regulatory Reform, SB 588, May 4, 1995, Tape 130, Side B (statements of Sen Dwyer describing purpose of delay provision and Rep Patricia Milne criticizing its effect as undermining owner right to refuse designation).

Similarly weighing against the Trust's argument is the fact that the legislature, presented with the opportunity to modify the existing statutory and regulatory framework that governed local historic preservation programs under Goal 5, chose to leave that framework intact. For example, although other legislation passed around the same time as the bill that created ORS 197.772 directed LCDC—the state agency tasked with developing and administering Oregon's statewide planning goals, including Goal 5—to amend its statewide planning goals and regulations in accordance with other specific changes to the same statutory scheme, the legislature did not provide any such direction to LCDC with respect to modifying its Goal 5 program in light of the new owner consent provisions enacted in ORS 197.772. *Compare* Or Laws 1995, ch 521, §§ 1-4 (bill passed earlier in the same month as SB 588 amending ORS chapter 197 and directing LCDC to "amend and adopt rules and guidelines, as necessary, to implement the provisions of this Act") *and* Or Laws 1995, ch 299, §§ 1-3 (bill passed six weeks before SB 588 directing LCDC to modify its approach to statewide land use planning in specific ways, for example, by requiring it to "allow for the diverse administrative and planning capabilities of local governments" and to "assess what economic and property interests will be, or are likely to be, affected by [a] proposed rule") *with* Or Laws 1995, ch 595, §§ 23-26 (bill passed two days before SB 588 modifying statute relating to LCDC's amendment of existing land use planning goals but neither addressing owner consent provisions to be enacted in ORS 197.772 nor modifying existing process for historic preservation under Goal 5). That the legislature did not modify that existing framework at all, nor direct LCDC to revise its regulatory approach to Goal 5, suggests that the legislature intended ORS 197.772(3) to operate in a way that would not significantly impact the overall scheme for historic preservation pursuant to Oregon's statewide planning goals and process as it existed at that time.

In light of that context, and the absence of any evidence suggesting that the legislature intended to dismantle the established statutory and regulatory framework for the protection of historic properties under Goal 5, we are hesitant to construe ORS 197.772(3) in a manner that would

lead to such a result. *Cf. [Baker v. City of Lakeside](#)*, 343 Or 70, 76, 164 P3d 259 (2007) (court is "hesitant" to read statute in manner inconsistent with well-established principles of law absent clear indication of intent); *see also, e.g.*, *State v. Miller*, 309 Or 362, 368-69, 788 P2d 974 (1990) (concluding that in light of legislature's long-standing preference for making offense of driving under the influence easier to prosecute, it was "preposterous" to infer that it revised statute to add requirement that driver have culpable mental state). Rather, considering the legislature's expression of support for *both* the use of local land use regulations to preserve historic properties and for the protection of property owners' economic interests, the most plausible interpretation of ORS 197.772(3) is one that furthers both of those objectives.

Finally, additional context supporting LOPS's interpretation of ORS 197.772(3) can be found in the dramatically different way that historic designation affects property owners, depending on when they acquired their property. As noted, when an historic designation is placed on a property for the first time, that action ordinarily triggers the application of legal restrictions—often in the form of local land use and zoning ordinances—on the owner's ability to use and develop that property. Rose, *Preservation and Community* at 497. That designation may have a significant, and sometimes negative, impact on the value of the property. *Id.* at 497-98; Asabere, *Adverse Impacts* at 232. It is for that reason that some see the imposition of an historic designation against the owner's wishes as a violation of that owner's property rights.

Such concerns are muted, however, when historic designation is enforced against an owner who acquired its property with the designation already in place, and who therefore had actual or constructive notice of such restrictions from the outset.[12] *See Dodd v. Hood River County*, 317 Or 172, 185, 855 P2d 608 (1993) (noting that when a property owner takes title with a land use regulation in place,

---

[12] Even if a local historic designation is not disclosed by a property title search, that information is public and readily ascertainable from planning authorities. *See, e.g.*, LOC 50.06.009 (2016) (provision of Lake Oswego city code listing all properties on Landmark Designation List and describing zoning restrictions applicable to listed properties).

owner has at least constructive notice that property's use is subject to those restrictions). At that point, to the extent that a previous designation may have diminished the property's value, that diminution is reflected at the time of transfer, and therefore, informs not only the reasonable expectations of the successor, *see id.* (regulations existing when owner takes property inform reasonable investment-based expectations as to its use), but the actual contents of the bundle of property rights that the successor obtains at that time. 73 CJS Property §§ 3-4, 6 (2016) (property interest in land includes right to use and develop land, subject to limits imposed by lawful land use regulations); *see also* ORS 93.040(1) (1995) (providing that any instrument transferring or contracting to transfer fee title to real property must include statement it does not convey right to use property in violation of applicable land use laws and that before accepting, party acquiring property should check with appropriate local government body to verify approved uses).

As a result, whatever harm an owner may suffer as a result of the imposition of an historic designation, that harm does not flow to its successor-in-interest, who acquires the property with notice of the designation and, most likely, at a price or valuation that reflects that designation. Under those circumstances, the ability to remove a previously-imposed designation at will would constitute a windfall for the successor. *Cf. Dodd*, 317 Or at 185 (having taken title with regulation in place and therefore with at least constructive notice of it, owner has no reasonable expectation of using property in manner inconsistent with that regulation). Considering that difference in the way that original and subsequent property owners are affected by an historic designation, it is more likely that the legislature intended the term "a property owner" in ORS 197.772(3) to mean the property owner at the time a property was designated, rather than an owner who acquired the property later.

The text of ORS 197.772, and the remedies that subsections (1) and (3) provide, is consistent with distinguishing between owners at the time of designation—whose economic interests may be adversely affected by the designation—and those who, because they acquired their property with the designation in place, have no reasonable

expectation of using their property in a manner inconsistent with any regulations that accompany that designation. If we interpret the phrase "a property owner" as applying only to owners at the time of designation in both ORS 197.772(1) and (3), all owners whose property interests may be harmed as a result of the imposition of an unwanted historic designation are protected in a similar manner from that harm. Subsection (1) addresses that potential harm by providing that owners who object to the designation of their properties may avoid designation during the designation process by refusing to consent in the first place. *See* ORS 197.772(1) ("Notwithstanding any other provision of law, a local government shall allow *a property owner* to refuse to consent to any form of historic property designation at any point *during the designation process.*" (Emphasis added.)). Subsection (3) provides an opportunity to the same group of owners to address the harm they have already experienced, by allowing them to refuse consent retroactively and remove those designations that were previously imposed on them. *See* ORS 197.772(3) (allowing "a property owner" to remove "a historic property designation that was imposed on the property by the local government"). On the other hand, all subsequent owners—who suffer no harm to their property interests—are bound by those historic designations that existed when they acquired the property.

As the foregoing analysis demonstrates, while the text of ORS 197.772(3) is ambiguous, the most plausible reading of that provision, when read in context, is one that furthers both the objective of historic preservation generally and the goal of ensuring that historic designations are not placed on properties against an owner's wishes. Considering the text against that background, we conclude that the legislature most likely did not intend ORS 197.772(3) to apply to *all* owners of designated properties, but instead to members of a more specific class: those who owned their property at the time that the designation was placed on the property.

C.   *Legislative History*

Because the legislative history is also helpful in this case, we consider whether it is consistent with the meaning that the text and context suggest. *See Gaines*, 346 Or at 172

(court may consider legislative history to the extent useful for statutory interpretation). As discussed below, there is nothing in the legislative history of ORS 197.772 that definitively answers the question of whether the removal provision in ORS 197.772(3) was intended to apply to successive owners of designated properties. That said, there is some evidence that bears on what the legislature expected to achieve in enacting that provision. Overall, that history weighs in favor of interpreting the phrase "a property owner" as referring only to owners at the time of designation.

One relevant aspect of a provision's legislative history is the particular purpose for which it was created. *See, e.g.*, *SAIF v. Drews*, 318 Or 1, 6-7, 860 P2d 254 (1993) (looking to legislative history of worker's compensation statute and considering purpose for which new language was added to discern legislature's intent). In this case, that background is both extensive and probative. Senate Bill 588—the bill that created ORS 197.772—originated in response to citizen agitation on the issue of property rights and local control, particularly by property owners in Yamhill County. *See* Tape Recording, Senate Committee on Water and Land Use, SB 588, Mar 30, 1995, Tape 78, Side A (statement of Sen Rod Johnson, Committee Chair, describing history of owner consent provisions in SB 588 and their 1993 predecessors in HB 2124); Exhibit 10, Senate Revenue & School Finance Committee, HB 2124, July 20, 1993 (statement of Yamhill County Commissioner Dennis Goecks, explaining impetus for legislation creating statutory right to refuse consent to local historic designation). In 1989, the Yamhill County Board of Commissioners had passed a local law, Ordinance 479, which made owner consent a condition precedent to any historic landmark designation. *Yamhill County*, 99 Or App at 444. That ordinance was created in response to specific concerns about property rights which had arisen from the application of Yamhill County's historic preservation law, enacted just the year before. *Id.*; *see also* Yamhill County Ordinance No. 479, p. 1 (Apr 19, 1989) (describing reasons for adopting ordinance).

Ordinance 479 contained two key provisions. First, it mandated that the local government "shall not designate

a landmark without the consent of the owner of the land-mark." Ordinance 479, Exhibit A § 4(6). Second, it included a mechanism for the removal of those designations that had already been imposed under the county's preservation ordi-nance, providing a period of 60 days after the ordinance went into effect during which owners of previously desig-nated properties could request to have those designations removed. *Id.* § 4(8)(a). That removal right was not open-ended, however. The ordinance also provided that after that initial remedial period, all existing historic designations, whether they were imposed on the property with the own-er's consent or not, would remain on the property so long as it continued to qualify for landmark status. *See id.* § 4(8)(b) (providing that after 60-day remedial period ended, "con-sent of the owner shall not be required to *continue* the desig-nation" (emphasis added)).

Ultimately, Yamhill County's attempt to condition the designation of historic properties on the owner's consent was short-lived. Opponents challenged Ordinance 479 and the Court of Appeals struck it down as inconsistent with the requirements of LCDC's implementing regulations for Goal 5. *Yamhill County*, 99 Or App at 446-47. The owner consent provisions enacted in ORS 197.772 were intended to over-ride that decision and to afford property owners across the state the same right that Ordinance 479 had attempted to provide constituents in Yamhill County: the right to refuse the imposition of an unwanted historic designation on their property. *See* Tape Recording, House Committee on General Government and Regulatory Reform, SB 588, May 2, 1995, Tape 126, Side A (statement of Rep Leslie Lewis explain-ing purpose of consent provisions);[13] Tape Recording, Senate Revenue & School Finance Committee, HB 2124, July 20, 1993, Tape 270, Side B (statement of Dennis Goecks, asking legislature to override decision in *Yamhill County* case and

---

[13] Representatives Patricia Milne and Leslie Lewis, co-sponsors of the removal provision enacted in ORS 197.772(3), both represented districts that included Yamhill County. Representative Milne was involved in earlier versions of the legislation that created ORS 197.772. *See* Minutes, Senate Committee on Revenue and School Finance, HB 2124, July 20, 1993 (testimony of Rep Patricia Milne urging passage of owner consent provision in 1993 version of historic prop-erty preservation bill).

give owners of historic properties right to refuse historic designation).

By the time that SB 588—the bill that created ORS 197.772—was passed and signed into law, nearly five years had passed since the Court of Appeals had overturned Ordinance 479. The removal provision, codified in ORS 197.772(3), was added to SB 588 for the express purpose of addressing that long delay and ensuring that the bill achieved its proponents' original intent. Tape Recording, House Committee on General Government and Regulatory Reform, SB 588, May 2, 1995, Tape 126, Side A (statement of Rep Leslie Lewis). As explained by one of the legislators who co-sponsored the amendment:

> "In [Yamhill] county, many people have been coerced into the historic property designation and I believe that some of those people are waiting for [this legislation] to become law so that they can petition to be removed from historic property designation."

*Id.* By allowing owners to remove historic designations that were previously imposed over their objections, the sponsors of the removal provision in subsection (3) aimed to bring the language of SB 588 closer to what its proponents in Yamhill County had been seeking all along. *See* Tape Recording, House Committee on General Government and Regulatory Reform, SB 588, May 2, 1995, Tape 126, Side A (statement of Rep Patricia Milne).

Given that history, it is unsurprising that the provisions in ORS 197.772 and Yamhill County Ordinance 479 are very similar. Both laws aimed to ensure that historic property designations were not placed on properties unless the owners consented, and both achieved that aim in two ways: first by providing that owners of properties that had not yet been designated had the right to refuse to consent during the designation process, and second by allowing owners whose property was already designated to request its removal. *Compare* Ordinance 479, Exhibit A §§ 5(6) - (8) *with* ORS 197.772(1), (3). As already discussed, however, Ordinance 479 did not make all historic designations permanently subject to the wishes of their owners, especially when the owner did not acquire the property until many

years later. It allowed only a limited time after its enactment during which owners could remove designations and specifically provided that, after that point, the owner's preferences would no longer be relevant to whether a previously designated property would remain designated. *See* Ordinance 479, Exhibit A § (5)(8).

The fact that the provisions codified in ORS 197.772 were created to achieve the same result as Ordinance 479 suggests that the state lawmakers who drafted and passed them did not intend the right to remove an historic designation under ORS 197.772(3) to be entirely open-ended, either. Rather, the narrowness of the removal provision in Ordinance 479 suggests that the legislature intended the removal provision in ORS 197.772(3) to provide a similarly limited removal right to only certain property owners. Likewise, the fact that Ordinance 479 provided that historic designations that were left in place would thereafter remain, so as long as the property continued to meet objective criteria, confirms that such designations were viewed as a long-term mechanism that would, and was intended to be, binding on subsequent owners.

The Trust contends that the facts that ORS 197.772(3) was created to override the Court of Appeals' decision in the *Yamhill County* case and that it was meant to aid a particular group of property owners does not mean that it cannot apply to other owners as well. As we have previously recognized, the legislature, in creating a statutory remedy, sometimes uses language that applies to a wider range of circumstances than the precise problem that triggered legislative attention. *Hamilton v. Paynter*, 342 Or 48, 55, 149 P3d 131 (2006). Nonetheless, that the legislature had a particular aim in mind is persuasive evidence of what it intended a provision to mean. *See, e.g.*, *State v. Partain*, 349 Or 10, 20, 239 P3d 232 (2010) (considering history of amendment, including that it was adopted in response to Court of Appeals decision, as relevant background informing analysis of what legislature likely intended).

Unlike cases where we have adopted the more expansive interpretation of an ambiguous statute, the legislative history of ORS 197.772(3) reveals that the legislators

who created that provision did intend something more specific. *See Walker*, 356 Or at 21 (describing and discussing prior cases where legislature has adopted broad solutions to specific problems and concluding that in that case, nothing in legislative history suggested legislature intended statutory term to be narrower than its ordinary meaning).[14] In fact, when SB 588 was still in committee, one legislator posed the very question now before this court:

> "[W]ould that mean that if somebody bought a piece of property that had been designated, *** that was clear when they bought it and then they move in and the minute they got there they could say, 'Well, we're sorry, we don't want to be historic anymore?'"

Tape Recording, House Committee on General Government and Regulatory Reform, SB 588, May 2, 1995, Tape 126, Side A (question by Rep Ross). Although no one answered that question directly, one of the removal provision's co-sponsors explained that they had created that provision to help those property owners, particularly in Yamhill county, who had, since the implementation of Goal 5, "been *coerced* into the historic property designation" and who had been waiting for the passage of a statutory remedy "so that *they* can petition to be removed from historic property designation." Tape Recording, House Committee on General Government and Regulatory Reform, SB 588, May 2, 1995, Tape 126, Side A (statement of Rep Leslie Lewis) (emphasis added). As to whether that provision could also apply to a subsequent purchaser, she noted that that was a situation that they "frankly hadn't thought about." *Id*.

   As the above-quoted exchange illustrates, this is not a case where the legislative history demonstrates that the legislators who enacted a provision were aware that it was likely to be read in a particularly broad way, and yet consciously declined to narrow it. *Cf. Walker*, 356 Or at 22 (more expansive interpretation of statutory text is particularly appropriate "where the legislative history demonstrates

---

[14] Given that the text in this case is reasonably susceptible to more than one interpretation, this is not a case where "the express terms of a statute indicate such broader coverage" such that "it is not necessary to show that [it] was [the legislature's] conscious purpose." *South Beach Marina, Inc. v. Dept. of Rev.*, 301 Or 524, 531, 724 P2d 788 (1986).

that the legislature was aware of the expansive nature of an enactment's text, yet chose not to narrow it"). The Court of Appeals found it significant that one legislator suggested that if the amendment to SB 588 that created the right to remove existing historic designations was passed, it could lead to the dismantling of local historic districts and that the legislature voted for it anyway. *Lake Oswego Preservation Society*, 268 Or App at 821. It appears that the court was referring to a comment by Representative Bryan Johnston during one committee hearing that the removal provision would "wreak havoc on the historic districts." *See* Tape Recording, House Committee on General Government and Regulatory Reform, SB 588, May 4, 1995, Tape 130, Side B (statement of Rep Bryan Johnston). The Trust argues that that comment shows that the legislature was aware that allowing the removal of designations could undermine existing programs under Goal 5 and, therefore, that the legislature intended the removal right in ORS 197.772(3) to apply more broadly.

What was meant by Representative Johnston's comment, however, is unclear. Although he was clearly concerned that the removal provision might negatively impact historic preservation efforts generally, he said nothing about the issue of whether subsequent owners of designated properties may invoke that right. To the extent that Representative Johnston was worried that allowing some owners to remove designations could undermine existing historic districts or make new ones less comprehensive, it does not follow that he and others anticipated, or expected, the long-term destabilization of the entire system of historic designation that would tend to result if any future owner could exercise the removal right in ORS 197.772(3). As a result, Representative Johnston's statement—made in isolation and without any follow-up explanation or discussion—is insufficient to support any inference about whether the legislature anticipated, or intended, that the removal right in ORS 197.772(3) would apply to subsequent property owners like the Trust.

Although the question was posed, no one asserted that that the removal provision in ORS 197.772(3) would

apply to owners who acquired their properties post-designation or that it would allow such owners to remove those designations—and any accompanying land use restrictions—that were in place at the time of acquisition. To the contrary, the legislators who created ORS 197.772(3) expressed the view that owners who acquired historic properties that were already subject to such restrictions would be bound by those restrictions. For example, when asked later in the same hearing whether the proposed removal right would affect the ability of local governments to protect previously identified historic properties through existing land use ordinances and regulations, one of the co-sponsors of that provision responded:

> "[Rep. Lewis:]   My intent *** is that those local ordinances are not disturbed because some of them might even be attached, too, as you purchase the property—You know that you are buying into [a downtown historic district], for example, and there are certain ordinances that you have to abide by.

> "[Rep. Ross:]   So this would not affect areas that are protected by local ordinance?

> "[Rep. Lewis:]   That's my intent, yes."

Tape Recording, House Committee on General Government and Regulatory Reform, SB 588, May 2, 1995, Tape 126, Side A (statement of Rep Leslie Lewis). As Representative Lewis's explanation clarifies, the legislators who created the designation removal provision in ORS 197.772(3) believed and anticipated that owners who acquired historic properties that were already subject to protection under local land use ordinances—and who, therefore, were not "coerced" into the historic property designation at all—would be required to abide by those ordinances.

That understanding also makes sense in light of the legislature's apparent concern with ensuring that Oregon's owner consent law was consistent with the National Historic Preservation Act, an issue to which substantial time was devoted in both houses during the 1995 session. *See, e.g.*, Tape Recording, Senate Water and Land Use Committee, SB 588, Mar 22, 1995, Tape 66, Side A (discussion between witnesses and legislators regarding operation of National

Historic Preservation Act and how proposed owner consent provisions related to that law); Tape Recording, House Committee on General Government and Regulatory Reform, SB 588, May 4, 1995, Tape 131, Side A (discussion between Bob Meinen, Director Oregon Parks and Recreation Department and Rep Markham regarding National Register and whether proposed owner consent provision was consistent with it) and Side B (statement of Rep Patricia Milne that purpose of SB 588 was to address potential conflict with National Registry program that arose with previous version of legislation passed during 1993 session).

As those discussions reveal, the legislators who supported the owner consent and removal provisions codified in ORS 197.772 were aware that while federal law requires the owner's consent for an individual property to be designated and added to the National Register of Historic Places, an owner who acquires a property that is already on the Register does not have the right to remove it. *See, e.g.*, Tape Recording, House Committee on General Government and Regulatory Reform, SB 588, May 2, 1995, Tape 126, Side A (statement of Rep Leslie Lewis, explaining National Register of Historic Places procedures, including that "[t]he person initially would have had some rights not to be on the listing, but if you buy a house already listed, you cannot get off the listing"); *see also generally* Bronin, *Historic Preservation Law* at 64-73 (describing how National Register of Historic Places works). By focusing on owner consent at the time of designation, rather than on the preferences of those who might later acquire a property, the legislature would have made Oregon's system of local historic designation consistent with that which was already in place under federal law.

That the legislature's overriding concern was protecting the interests of property owners at the time of designation, and that the removal provision in ORS 197.772(3) was intended as a limited remedy for those owners whose property interests had been negatively affected by the imposition of an historic designation against their will, is confirmed by other statements made while SB 588 was in

committee. For example, when another legislator asked a question about how the various subsections of the owner consent statute would work together, one of the removal provision's co-sponsors reiterated that it was intended to help those owners who had designations imposed on "them":

"[Rep. Johnston:]   I'm just trying to understand how these things merge. \*\*\* [W]e are granting a property owner the right to refuse consent to any form of historic property [designation]—if they choose to. They could choose to agree. You know, I have a piece of property in downtown Ashland, and I decide to agree. Could I then, under [the removal provision], then decide, two years later to take it out?

"[Rep. Milne:]   Representative Johnston, my intent in this amendment, where it says on line 3, that the 'historic designation that was imposed on the property,' my feeling there is that what we are trying to say—what my intent was—was that when property owners *were not allowed to consent* and the government *imposed it on them*, that now they would have an opportunity to remove their property from that designation.

"[Rep. Johnston:]   Okay let's call that Class A, so I understand those. So now I'm talking about Class B, a person who does it under [subsection (1)]—had the opportunity to not do it, went ahead and did it—can they, two years later, under [subsection (2)] take their property out?

"[Rep. Milne:]   That was not my intent Representative Johnston."

Tape Recording, House Committee on General Government and Regulatory Reform, SB 588, May 4, 1995, Tape 130, Side B (exchange between Rep Bryan Johnston and Rep Patricia Milne) (emphasis added). As Representative Milne's explanation suggests, the drafters' intent was not to make local historic designations permanently contingent on the desires of the persons who own that property at any point in time, but to provide a remedy for those particular owners who, *at the time of designation*, "were not allowed to consent" and who, therefore, had historic designations imposed "*on them*." *Id.*[15]

---

[15] The Court of Appeals relied on this exchange in concluding that the removal provision of ORS 197.772(3) was not intended to be limited to the property owner at the time of designation. 268 Or App at 821. As discussed in the

The Trust complains that the legislative history bearing on what the legislature intended the text of ORS 197.772(3) to mean is limited in nature and does not exclude the possibility that that provision applies to successive owners of involuntarily designated properties. Were there little else to aid us in discerning what the legislature intended, we might be reluctant to rely on the sort of legislative history that is available here. However, as our discussion in the foregoing sections demonstrates, that history is consistent not only with the text of ORS 197.772(3), but with the extensive legislative and regulatory background against which the legislature acted when it created that provision.[16]

That background shows that the legislature's interest in enacting the owner consent provisions set out in ORS 197.772 was not to make all local historic designations permanently contingent on an owner's wishes, nor to simply unburden properties from existing designations that are now unwanted. Rather, the legislature sought to create a system where, to the extent possible, historic designations are not placed on properties unless the owner at that point in time agrees. Even as the legislature sought to make the process of designating properties as historic voluntary, however, it understood the value of local historic preservation programs under the Goal 5 framework and wished to continue to foster the long-term protection of historic properties through such programs.

With the creation of ORS 197.772, the legislature adjusted what some saw as an unfair system and struck

---

text, however, the focus of the exchange was on the meaning of the requirement in the statute that the designation be "imposed" on the property. Although it is true that Representative Milne's response does not exclude the possibility that the term "a property owner" includes successors-in-interest, it offers no support for the conclusion that it does except by negative inference.

[16] Furthermore, the legislative history to which the Trust points in support of its reading of ORS 197.772(3) is thin and far less persuasive than that which supports LOPS's reading of that statute. For example, the Trust relies heavily on the fact that one particular amendment to the owner consent statute, which would have specified that consensual designations run with the land to subsequent owners, was stripped from the bill by the conference committee. In so doing, the Trust asks us once again to draw several negative inferences from legislative silence and inaction. For the reasons already discussed, however, that aspect of the legislative history is not helpful, especially given that the legislative record offers no indication as to why that amendment was ultimately rejected.

a new and careful balance between those two objectives. Although local governments continued to be required, pursuant to Goal 5, to identify, designate and regulate historic resources in order to protect them long-term, those owners whose property interests were adversely affected by local historic designation were guaranteed a role in determining whether their property became subject to that regulatory regime. But later owners, who acquired properties that already had been designated as historic, acquired those properties subject to that designation and the restrictions that accompanied it.

## III.  APPLICATION

We now turn to the question of whether the Trust may utilize ORS 197.772(3) to remove the historic designation from the Carman House. As discussed above, a property owner must satisfy two requirements to use the statutory remedy in ORS 197.772(3) to remove an historic designation that was previously placed on its property. First, the owner must establish that it was the owner of the property at the time that it was designated. Second, it must establish that the designation was "imposed" on the property by the local government.

Although the record is not complete as to the history of conveyances for the Carman House, the salient points are clear. The property was acquired in 1978 by Richard Wilmot, a descendant of the original settlers who established the homestead and built the Carman House, together with his wife, Mary Wilmot. In 1990, the city of Lake Oswego included the property on its inventory of historic properties, designating it as a landmark because it was part of an historic "farm complex." At that time, Richard Wilmot objected to the designation and sought, unsuccessfully, to have it removed. Two years later, the city reconsidered its decision and, in 1992, after assessing the value of the Carman House as a stand-alone landmark, determined that the historic designation on that property should be retained. That designation remains in place today. Eventually, the property changed hands when, in 2001, Mary Wilmot transferred it by warranty deed to her son Richard Wilmot II, as the trustee of the Mary Cadwell Wilmot Trust. In order to

facilitate the development of the property, the Trust began its effort to have the historic designation removed in 2013.

For the reasons discussed, we agree with LUBA that the right to remove an historic designation under ORS 197.772(3) applies only to those owners who held title when a local historic designation was first imposed and not to those whose property was already designated at the time they acquired it. Because the Trust acquired the Carman House property after it was designated, it does not qualify as "a property owner" within the meaning of ORS 197.772(3). As a result, the Trust cannot use ORS 197.772(3) to remove the historic designation from the Carman House now.[17]

The decision of the Court of Appeals is reversed. The final order of the Land Use Board of Appeals is affirmed.

---

[17] Because we conclude that the Trust does not qualify as "a property owner" within the meaning of ORS 197.772(3), we do not reach the question of whether the designation at issue in this case was "imposed" by the city.